IN THE SUPREME COURT OF PENNSYLVANIA
MIDDLE DISTRICT

**SAYLOR, C.J., BAER, TODD, DONOHUE, DOUGHERTY, WECHT, MUNDY, JJ.**

| | | |
|---|---|---|
| CITY OF ALLENTOWN | : | No. 24 MAP 2016 |
| | : | |
| | : | Appeal from the Order of the |
| v. | : | Commonwealth Court dated August 7, |
| | : | 2015 at No. 1802 CD 2014, affirming in |
| | : | part and reversing in part the Order of |
| INTERNATIONAL ASSOCIATION OF | : | the Court of Common Pleas of Lehigh |
| FIRE FIGHTERS LOCAL 302 | : | County, Civil Division, dated September |
| | : | 8, 2014 at Nos. 2013-C-4397 and 2013- |
| --------------------- | : | C-4438 |
| | : | |
| INTERNATIONAL ASSOCIATION OF | : | ARGUED: September 13, 2016 |
| FIRE FIGHTERS LOCAL 302 | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| CITY OF ALLENTOWN | : | |
| | : | |
| | : | |
| APPEAL OF: INTERNATIONAL | : | |
| ASSOCIATION OF FIRE FIGHTERS | : | |
| LOCAL 302 | : | |

## OPINION

**JUSTICE TODD**                                        **DECIDED: March 28, 2017**

In this appeal by allowance, we consider, in the context of an interest arbitration award, whether a provision requiring a certain minimum number of firefighters on duty per shift is a mandatory subject of bargaining or a non-bargainable managerial prerogative. For the reasons set forth below, we conclude that the number of required firefighters per shift is a mandatory subject of bargaining, and implicates managerial

responsibilities, but does not unduly infringe upon those managerial rights, and, thus, may properly serve as a component of an interest arbitration award. Thus, we reverse the order of the Commonwealth Court.

The background of this matter is not in dispute. The right of firefighters and police officers to collectively bargain for purposes of wages, hours, and working conditions is secured through the Police and Firemen Collective Bargaining Act, commonly known as Act 111. *See* 43 P.S. §§ 217.1 - 217.10. Appellant, the International Association of Fire Fighters, Local 302 ("IAFF"), is the exclusive bargaining representative for the firefighters of Appellee, the City of Allentown (the "City"), for purposes of collective bargaining with the City. The City and the IAFF were parties to a seven-year collective bargaining agreement which ran from January 1, 2005 through December 31, 2011.

This agreement contained a provision mandating certain minimum staffing levels of firefighters per shift. Specifically, Article 26(B) of the agreement set a minimum on-duty shift strength of no less than 26 firefighters as of January 1, 2005; no less than 27 firefighters as of January 1, 2006; and no less than 28 firefighters as of January 1, 2007.

In May 2011, the parties began to bargain over a successor contract, but could not reach an agreement. The City declared an impasse,[1] and requested binding

---

[1] An impasse, in the context of labor relations, is a state of deadlock where no agreement is possible. *See Commonwealth, Office of Administration v. PLRB*, 598 A.2d 1274, 1276-77 (Pa. 1991). It is the "point at which the parties have exhausted the prospects of concluding an agreement and further discussions would be fruitless -- but its application can be difficult. Given the many factors commonly itemized by the [National Labor Relations] Board and courts in impasse cases, perhaps all that can be said with confidence is that an impasse is a 'state of facts in which the parties, despite the best of faith, are simply deadlocked.'" *Norwin School District v. Belan*, 507 A.2d 373, 380 n.9 (Pa. 1986).

interest arbitration.[2]  *See* 43 P.S. § 217.4.  An arbitration panel was selected, and proceedings were conducted, including hearings in November 2011, an appeal to the Lehigh County Court of Common Pleas, and a remand of the matter for an additional day of hearings, which was held on April 22, 2012.

Ultimately, the interest arbitration panel issued its final Opinion and Award on November 6, 2013.  The award established a new collective bargaining agreement for the period January 1, 2012 (covering the period after the expiration of the prior agreement) through December 31, 2015.  The award also made modifications to issues of wages, sick leave, vacation, pension, and overtime.  Relevant for purposes of this appeal, the panel determined that the previous contract's requirements found in Article 26(B) regarding the City's implementation of staffing and the requirement that the City employ a certain number of firefighters were suspended, and instead, declared that "there shall be a manning scheduling requirement of twenty-five (25) per shift, which shall include all scheduled personnel including command positions."  *In the Matter City of Allentown v. IAFF*, AAA Case No. 14 360 L 00947 11, dated July 11, 2012, at 5 (reissued in supplemental Opinion and Award in *In the Matter City of Allentown v. IAFF*, AAA Case No. 14 360 L 00947 11, dated September 23, 2013 and finalized on November 6, 2013).  The panel also provided that the City was not obligated to recall firefighters to replace any scheduled firefighter if the number of firefighters called to report to work on any shift fell below 25, where such absence was due to the use of a sick day, due to disability leave, or due to the use of any other unanticipated paid or

---

[2] The statutory dispute resolution process utilized when a public employer and bargaining agent are at impasse and unable to agree to a new contract is known as "interest arbitration."  This may be contrasted with the process by which parties to a collective bargaining agreement resolve disputes which arise under that existing contract which is known as "grievance arbitration."  *Michael Lutz Lodge No. 5. v. City of Philadelphia*, 129 A.3d 1221, 1222-23 (Pa. 2015).

unpaid leave, except for a previously scheduled vacation or personal day. *Id.* In effect, the award, which crafted a new agreement from January 1, 2012 through December 31, 2015, suspended Article 26(B)'s minimum shift staffing requirements until the expiration of the new agreement, and, during the term of the agreement, the minimum staffing requirement was set at 25 individuals per shift.

The City filed a petition with the Lehigh County Court of Common Pleas to partially vacate the award on the basis that, *inter alia*, the provision covering the number of firefighters required per shift was a managerial prerogative and beyond the power of the arbitration panel to compel. The IAFF also filed a petition to partially vacate the arbitration award, challenging certain aspects of sick leave requirements and pension benefits.

The Lehigh County Court of Common Pleas, in an opinion by Judge Douglas Reichley, considered, *inter alia*, the City's argument that the minimum on-duty shift strength provision was a non-bargainable managerial prerogative. Relying upon the Commonwealth Court's decision in *IAFF, Local 669 v. City of Scranton*, 429 A.2d 779, 781 (Pa. Cmwlth. 1981) (addressing whether establishing a total number of departmental firefighters constituted a managerial prerogative, as discussed below), the court considered the relationship between staffing levels and the firefighters' duties. While recognizing total employment numbers were a matter of managerial authority, the court opined, based on the hearing testimony, that the specific numbers of individuals on duty at any given time was rationally related to the duties and safety of firefighters. As issues rationally related to firefighter safety are subject to arbitration, the court concluded that the number of on-duty firefighters per shift was not a managerial prerogative, but, rather, was subject to the interest arbitration panel's jurisdiction. Therefore, the court denied the City's petition to vacate Article 26(B) of the new

collective bargaining agreement, per the arbitration panel's award.[3]  The City appealed the Court of Common Pleas' decision to the Commonwealth Court.

An *en banc* Commonwealth Court affirmed in part and reversed in part in a split decision.  Writing for the majority, then-President Judge, now-Senior Judge, Dan Pellegrini explained that the staffing inquiry initially focused upon whether the subject matter implicated a managerial responsibility, and, then, whether the award unduly infringed upon that right.  In approaching the question, the court considered two of its decisions which marked a distinction between provisions affecting staffing requirements and those affecting the overall number of employees to be employed.  In *City of Scranton*, the Commonwealth Court considered an arbitration panel award which mandated that the City of Scranton increase its minimum number of firefighters to 225 persons.  The city challenged the award, contending the size of the force was a managerial prerogative and not subject to an arbitration award.  The Commonwealth Court concluded that determining the size of a fire department was a managerial prerogative for the municipality, as such decisions had far reaching political and economic implications.  In contrast, in *Appeal of City of Erie*, 459 A.2d 1320 (Pa. Cmwlth. 1983), the court addressed an arbitration panel award which mandated a minimum crew of four on each firefighting rig.  Relying upon testimony that less than four firefighters on a rig could impair the firefighters' safety, the *City of Erie* court distinguished *City of Scranton*, reasoning that the safety of a firefighter was more rationally related to the number of persons with whom he or she was fighting a fire or operating a piece of equipment than to the total complement of members on the force.

---

[3] The court ultimately granted, in part, the City's petition, granted in part and denied in part the IAFF's petition, and remanded the matter to the arbitration panel for consideration of other issues which are not relevant to this appeal.

Considering these decisions, the Commonwealth Court in the matter *sub judice* determined that the minimum shift staffing requirement implicated both the terms and conditions of employment for firefighters and the City's managerial responsibilities, and, thus, turned to whether that mandate unduly infringed upon the City's managerial responsibilities. Noting that staffing levels impact government spending, budgeting, level of fire protection, and taxation, the court concluded that requiring minimum shift staffing unduly infringed upon the City's managerial responsibilities by restricting its decisions concerning the fire protection levels it desires or can afford. Therefore, the court found that the arbitration panel's minimum staffing mandate concerned a managerial prerogative which lies outside of the scope of collective bargaining, and, thus, was beyond the arbitration panel's authority to impose. Accordingly, the court reversed the trial court's order denying the City's petition to vacate the shift staffing requirements.[4]

Judge Kevin Brobson filed a dissenting opinion. He reasoned that, while the minimum shift staffing provision touched upon a managerial responsibility, because the City presented no evidence of undue infringement, he could not conclude that the arbitration panel erred under the narrow *certiorari* standard of review. Judge Patricia McCullough also filed a dissenting opinion, finding that the evidence of record established that the minimum shift requirement related to firefighter safety, and, thus, was subject to mandatory bargaining. She further offered that the minimum shift staffing mandate was distinguishable from other mandates affecting the total number of firefighters which had been found to be an inherent managerial prerogative.

---

[4] Judge Robert Simpson concurred in the result.

We granted allocatur principally on the issue of whether minimum shift staffing is a mandatory subject of bargaining, or a managerial prerogative that is not subject to bargaining and, therefore, not properly the subject of an Act 111 interest arbitration award. *City of Allentown v. IAFF*, 2016 Pa LEXIS 378 (Pa. filed March 3, 2016) (order). As this question arises in the context of review of an Act 111 interest arbitration award, we review the award under the limited standard of narrow *certiorari*. Specifically, under this standard, a court's review of an interest arbitration award is limited to consideration of questions concerning: (1) the jurisdiction of the arbitrators; (2) the regularity of the proceedings; (3) an excess of the arbitrator's power; and (4) the deprivation of a constitutional right. *Michael Lutz Lodge No. 5. v. City of Philadelphia*, 129 A.3d 1221, 1227 (Pa. 2015). The third question is implicated herein.

Before turning to the parties' arguments, it is beneficial to consider the legal background and framework by which we analyze questions involving topics of bargaining, managerial responsibilities, and the decisional law regarding bargaining over the staffing of public-safety personnel.

While private sector employees enjoyed legal protection of the right to organize and collectively bargain with their employer beginning in the late 1930s, the law denied such rights to public-safety employees. *See Pennsylvania State Police v. Pennsylvania State Troopers Association (Betancourt)*, 656 A.2d 83, 88-89 (Pa. 1995). Resultant disharmony in the public-safety arena, and, at times, illegal and disruptive strikes, led to legislative reform by the late-1960s. Act 111, enacted in 1968, was viewed as a compromise — "a more perfect balance between the need of the Commonwealth to insure public safety and the rights of the worker." *Betancourt*, 656 A.2d at 89. It was a restorative and remedial measure, as it conferred on public-safety employees, such as police and firefighters, the right to collectively bargain and the right to interest

arbitration, promising the timely and final resolution of bargaining issues. Yet, due to the essential services provided by these employees, the prohibition on striking by public-safety employees remained intact.[5]

More specifically, and as explained in *Borough of Ellwood City v. PLRB*, 998 A.2d 589, 596 (Pa. 2010), the right to collectively bargain over the terms and conditions of employment was crucial to the essential compromise which resulted in the restoration and maintenance of the relationship between public-safety personnel and their municipal employer. With respect to collective bargaining — central to the rights created by the new legislation — Act 111 permitted police and fire personnel the right to negotiate over "the terms and conditions of their employment, including compensation, hours, working conditions, retirement, pensions and other benefits, and . . . the right to an adjustment or settlement of their grievances or disputes in accordance with the terms of this act." 43 P.S. § 217.1.

While the granting of collective bargaining rights to police and firefighters over topics relating to the terms and conditions of employment was the engine that drove Act 111 and resulted in greater labor harmony, managerial prerogatives were not deemed to be subject to the bargaining process. *Borough of Ellwood City*, 998 A.2d at 599-600. The rationale for this extra-statutory limitation on bargaining[6] is that such topics are essential to a municipality in managing its employees and providing government services; even more so, certain managerial matters "strike at the heart of policy decisions that directly implicate the public welfare, and, thus, should be insulated from

---

[5] 43 P.S. § 215.2.

[6] Indeed, while not at issue in this matter, we note that the Public Employe Relations Act specifically limits the topics of bargaining, offering, "public employers shall not be required to bargain over matters of inherent managerial policy." 43 P.S. § 1101.702.

the give-and-take of collective bargaining." *Id.* at 600. Topics that fall into the category of inherent managerial prerogatives include "the functions and programs of the public employer, standards of services, its overall budget, utilization of technology, the organizational structure, and selection and direction of personnel." *Id.* at 599 (citations omitted). As we stated in *City of Philadelphia v. IAFF, Local 22*, "matters of managerial decision-making that are fundamental to public policy or to the public enterprise's direction and functioning do not fall within the scope of bargainable matters." 999 A.2d 555, 569-70 (Pa. 2010).

The issue of whether a topic is a mandatory subject of bargaining or a managerial prerogative that is not subject to negotiation governs whether that topic may be a component of an Act 111 interest arbitration award. Specifically, in *City of Philadelphia*, our Court explained that, as Act 111 does not permit an illegal act, an arbitration panel "exceeds its powers if in its award it mandates that such an act be carried out." 999 A.2d at 565. We developed that an arbitration panel is "'empowered to award any term or condition of employment to which a public employer and its police or fire employees may voluntarily agree,' but is not empowered 'to address issues outside of that realm.'" *Id.* Therefore, an arbitration award that incorporates matters not subject to collective bargaining, such as topics that constitute inherent managerial prerogatives, implicates an excess powers claim under the narrow *certiorari* standard of review of Act 111 arbitration awards. *Id.*

Thus, ultimately, we are attempting to discern the legislature's intent regarding the rights and duties of municipal employers and unions regarding collective bargaining — more specifically, and as described in detail below, we must discern what are the proper subjects of bargaining, what are managerial responsibilities, and what are managerial prerogatives. Regarding subjects of bargaining, the General Assembly

could have supplied an exhaustive list of all mandatory subjects of bargaining, but it did not do so. 43 P.S. § 217.1. While providing certain examples of subjects of bargaining, such as "hours," which has caused relatively little difficulty, the legislature employed more open-ended terminology as well, such as "terms and conditions of employment," and "other benefits," the nature of which has been debated and left to administrative and judicial determination. *See id.*; *City of Philadelphia*, 999 A.2d at 566-67 (finding the General Assembly did not purport to subject every decision a public entity makes to collective bargaining, that certain statutory subjects of bargaining are subject to interpretation, and that delineation of matters that are subject to collective bargaining is ultimately a question of statutory construction). As we noted in *City of Philadelphia*, "[s]ince the General Assembly did not provide a statutory standard in Act 111 for the courts to use to distinguish between those awards . . . that are consistent with the scope of collective bargaining . . . and those awards that are not, this Court must." *Id.* at 571.

However, the divisions between these topics are not always clear. One may envision a Venn diagram with topics in the overlapping space that are terms and conditions of employment — which are subject to collective bargaining, and may serve as the part of an interest arbitration award — that also implicate matters of managerial responsibility — over which negotiation is not mandated, and which cannot serve as the basis for an arbitration award. As explained below, mandatory minimum shift staffing is one of these topics.

In these circumstances, our Court has created a framework by which to analyze and resolve whether such overlapping topics are subject to mandatory negotiation and may be a component of an interest arbitration award, or whether they are insulated from collective bargaining as a managerial prerogative and not permitted to be part of such an award. *Borough of Ellwood City* (arising in challenge to ban on use of tobacco

products in workplace); *City of Philadelphia* (arising in context of closure of fire companies). Specifically, given the history of Act 111, its terms, and the interpretation of that legislation by our Court, when considering topics that are the subject of an interest arbitration award which may implicate both mandatory subjects of bargaining and managerial responsibility, a court should initially determine whether the topic is subject to the right of collective bargaining — i.e., whether it is rationally related to the terms and conditions of employment. If the topic does not speak to a mandatory subject of bargaining, the inquiry ends and the award must fail. If the topic is germane to the terms and conditions of the workplace, the court should next ask whether the award also implicates a managerial responsibility. If not, the award must be upheld as the topic is bargainable, and within the authority of the arbitration panel to address.

If, however, the topic is both a mandatory subject of bargaining *and* implicates managerial responsibilities, the final inquiry is "whether collective bargaining over the topic would *unduly infringe* upon the public employer's essential managerial responsibilities." *Borough of Ellwood City*, 998 A.2d at 600 (emphasis added). If bargaining over the subject would unduly infringe upon managerial responsibilities, the topic will be considered a managerial prerogative and non-bargainable, and, thus, unable to serve as the basis for an interest arbitration award. If not, the topic is subject to mandatory collective bargaining and may serve as a basis for an arbitration panel's award.[7] *Id.*; *City of Philadelphia*, 999 A.2d at 570-71.

---

[7] As suggested in the text, for purposes of clarity, we adopt the following nomenclature: topics that are both a proper subject of collective bargaining and implicate managerial rights or responsibilities, that unduly infringe upon these rights or responsibilities, are deemed to be "managerial prerogatives," which are non-bargainable and may not be a component of an interest arbitration award.

Moreover, the burden shifting contemplated by this construct is fairly straightforward. It is incumbent upon the bargaining representative to initially establish to the arbitration panel (or court) that the topic is subject to the right of collective bargaining — i.e., that it is rationally related to the terms and conditions of employment. The burden then shifts to the municipality to establish that the subject is a managerial responsibility. If it is established that the topic is both a proper subject of bargaining and a managerial responsibility, it is then necessary for the municipality to convince the tribunal that bargaining over such topic — and having that subject be a component of an interest arbitration award — would unduly infringe upon the municipality's responsibilities, and, thus, constitutes a managerial prerogative.[8] With this three-step analytical construct in mind, we turn to the arguments of the parties.

_____

[8] We also granted allocatur on the nature of the burden on a municipality seeking to establish that a topic unduly infringes upon its managerial responsibilities. The IAFF, echoing Judge Brobson's dissent, asserts that a municipality must provide some evidence of an undue infringement upon its managerial rights, and, here, asserts the City failed to present any evidence of such infringement. The City counters that undue infringement of managerial responsibilities is established by the "loss of the ability to make a managerial decision, such as the selection and direction of personnel, which has ancillary effects on other essential managerial rights, including budgetary decisions and even taxation of its citizens." Appellee's Brief at 30. To the extent actual evidence is required to establish undue infringement, the City offers that it submitted extensive evidence in this regard. Neither party cites directly relevant legal authority on this question.

We reject the imposition of a concrete requirement that testimonial or documentary evidence is necessary in all cases to support a claim that a topic unduly infringes upon managerial responsibilities. Indeed, we can envision certain subjects that, by their very nature, or by statute, work an undue infringement on a municipality's managerial rights, such as a specific directive regarding an overall budget, the level of provision of services, or the total force size. It is axiomatic that these are topics which lie exclusively within the domain of the municipality as a managerial prerogative, and, hence, may be established without any testimonial or documentary evidence. *See Borough of Ellwood City*, 998 A.2d at 599; *Borough of Morrisville v. Morrisville Borough Police Benevolent Association*, 756 A.2d 709, 711 (Pa. Cmwlth. 2000) (holding relevant substantive statute rendered topic a managerial prerogative). Conversely, many topics may necessitate an understanding of how a municipality's responsibilities are unduly infringed upon, such (continued…)

The IAFF first notes that, while it has been determined by prior decisional law that setting a minimum staffing on a per apparatus basis is not a managerial prerogative, and setting a minimum number for the total complement of firefighters does infringe upon such managerial right, the question of minimum shift staffing falls between these two topics. The IAFF offers that, in *City of Philadelphia*, we cited with approval

---

(…continued)

as was required regarding the topic of mandatory staffing for particular equipment. *See City of Erie*, 459 A.2d at 1321. Thus, we decline to require that, in all cases, a municipality must provide testimony or documentary evidence establishing an undue infringement on its managerial prerogatives.

We acknowledge Justice Dougherty's viewpoint as expressed in his Concurring Opinion which seeks to require testimonial or evidentiary evidence in every case addressing whether a topic unduly burdens a managerial responsibility. Yet, respectfully, not only do we conclude such an approach to be too strict as a matter of policy, as noted above, but such an approach is contrary to our prior precedent which has not, in all instances, required such evidence, and indeed has drawn these legal conclusions without reliance on the factual record. *See, e.g., Borough of Ellwood City*, 998 A.2d at 601 ("Furthermore, we find that the topic of workplace tobacco usage is unlike those significant core entrepreneurial topics that are more naturally considered to be inherently managerial in nature such as decisions regarding the programs of the employer, standards of service, overall budget, use of technologies, organizational structure, and selection and direction of employees."); *City of Philadelphia*, 999 A.2d at 572 (focusing solely on challenged provision of arbitration award and holding the requirements of such provision unduly infringed upon city's essential managerial responsibilities, explaining, "[a]s to decisions regarding fire company closures, in Paragraph 12, the Award takes from the City the complete control it had over of its own decision-making process as to a subject that indisputably lies within its sole discretion under Act 111. . . . [T]he provision has the capacity to assert a profound influence over the City's closure decision, and ultimately, the City's policy judgments as to spending, budgeting, levels of fire protection and emergency medical services it should provide, and the prioritization and allocation of competing essential services."); *Department of Corrections v. Pennsylvania State Corrections Officers Association*, 12 A.3d 346, 358 (Pa. 2011) (reasoning that, because public employer has discretion under Pennsylvania Code to provide representation, bargaining over such benefit would not unduly burden managerial responsibilities); *Borough of Morrisville*, 756 A.2d at 711 ("In fact, because the Board allocates excess pension interests only 'at the direction of [the] municipalities' or 'as each municipality deems appropriate,' we conclude that the [Pennsylvania Municipal Retirement Law] has made the allocation of excess pension interest an inherent managerial prerogative of the municipalities.").

*City of Scranton* in which the Commonwealth Court found that a contract provision mandating that the city increase its total complement of firefighters to 225 employees was illegal, as it unduly infringed upon the city's inherent managerial prerogative to determine force size. In doing so, the *City of Scranton* court explained that "[t]he courts that have dealt with this issue have drawn a very fine line in distinguishing between the total number of persons on the force (not arbitrable), and the *number of persons on duty at a station*, or assigned to a piece of equipment, or to be deployed to a fire (all arbitrable because they are rationally related to the safety of fire fighters)." *City of Scranton*, 429 A.2d at 781 (emphasis added). The IAFF also points to the Commonwealth Court's decision in *City of Erie*, wherein the court concluded that an arbitration award requiring a minimum crew on each firefighting rig of four persons did not impact an inherent managerial responsibility, but was arbitrable as rationally related to the safety of firefighters.

The IAFF submits that the number of persons on a shift, from a safety perspective, is more closely analogous to the "number of persons on duty at a station" than it is to the total number of firefighters working for the force. Thus, the IAFF concludes that the minimum shift requirement provision in Article 26(B) is not illegal and that that part of the arbitration panel's award should be upheld.

Further, the IAFF points to the testimony of Art Martynuska, President of the Pennsylvania Professional Firefighters, and Lieutenant Christian Williams of the Allentown Fire Department and Vice President of IAFF Local 302, in support of the connection between safety and minimum shift requirements. Specifically, the IAFF proffers that both witnesses explained that the population of the City of Allentown, the density of its housing, other demographic factors, and the number of fire calls, combined with the number of firefighters employed per shift, have a direct and

significant impact upon the health and safety of the firefighters. These witnesses offered that the fewer firefighters on shift, the more likely those firefighters would be injured in their jobs.

Turning to whether the minimum shift mandate unduly infringes upon the City's exercise of managerial rights, the IAFF contends that topics that impact such rights go to the level of fire protection the municipality desires or can afford to provide. Appellant's Brief at 25. According to the IAFF, shift staffing does not unduly infringe upon a municipality's responsibilities, but allows it to retain the "authority to decide whether to hire more employees, close stations, revamp the force, or take some other managerial action." *Id.* (citing *City of Scranton*, 429 A.2d at 781). The IAFF argues that the City may hire or lay off as many employees as it desires, or change shift length, and still meet the safety needs of the firefighters, all without being forced to employ a certain overall number of firefighters. The IAFF claims that setting a minimum shift requirement is no different than setting a minimum number of firefighters on a piece of equipment or at a fire station, both of which it submits are mandatory subjects of bargaining.

Moreover, the IAFF offers that the arbitration panel eliminated any undue infringement by refusing a *per se* minimum shift requirement, as the City was relieved of the minimum obligation where the number of firefighters fell below 25 in a shift due to sick leave, disability, or other type of unscheduled unpaid leave. The IAFF reasons that the arbitration panel found a rational relationship between the mandate and the firefighter's condition of employment, then found the City's managerial responsibilities would not be unduly infringed upon as the shift mandate was not absolute, thus,

achieving a compromise between firefighter safety and the City's prerogative to determine the type of fire service it wants to provide to its citizens.[9]

The City counters that the Commonwealth Court properly found the issue of minimum shift staffing not to be a proper subject of bargaining, and, thus, that such provision exceeded the powers of the arbitration panel. The City first notes that an Act 111 award must encompass only terms and conditions of employment, and not include issues that fall outside of those topics. Appellee's Brief at 14 (citing *Betancourt*, 656 A.2d at 90). Here, because the issue of minimum staffing concerns matters that are not subject to the right of collective bargaining under Act 111, the City contends the arbitration panel exceeded its powers under the narrow *certiorari* standard of review. Id. at 15.

Turning to the *Borough of Ellwood City* standard, the City first acknowledges that minimum staffing concerns a topic that is subject to bargaining. It then takes the position that the issue also "constitutes a managerial prerogative as it directly results in determining the overall manning of the Department, thereby unduly infringing on the City's managerial prerogatives." Appellee's Brief at 16. In support of its argument, the City claims that a decision regarding the number of personnel to employ has been consistently regarded as a managerial prerogative, and that the minimum shift staffing issue implicates the same concerns as overall force staffing. Citing *City of Scranton*, the City notes that, in that decision, the Commonwealth Court held that the number of firefighters an employer deems appropriate is a managerial prerogative that is not arbitrable. The City further offers that the court in *City of Scranton* cast the issue as

---

[9] *Amici* Pennsylvania Professional Firefighters Association and Pennsylvania State Lodge, Fraternal Order of Police, as well as the International Association of Fire Fighters, Local 1, filed briefs on behalf of the IAFF, largely echoing the IAFF's arguments.

whether members of fire and police forces are to decide "how much of the municipal budget will be spent in the areas of fire and police protection," and focused on the members having "the right to have a major decision-making impact on government spending, budgeting, the level of police and fire protection that the municipality must provide, and even taxation, because salaries for the additional employees must come from public funds." Appellee's Brief at 18 (quoting *City of Scranton*, 429 A.2d at 781).

The City further explains that minimum shift staffing has the effect of setting a minimum budget for its fire department, below which the City is unable to fall regardless of need or whether the City could afford that service. The City develops that minimum shift staffing "was a major contributor to skyrocketing overtime, which in turn lead [sic] to spiking pension costs," as overtime compensation is used in the calculation of pension benefits. Appellee's Brief at 19. Thus, according to the City, it must be left with the ultimate determination of the level of fire protection to be provided, and a minimum shift staffing provision eliminates such discretion. The City goes further and rejects the contention that it can revamp the force, eliminate certain apparatus, or close stations, as, according to the City, it will have to schedule and pay the minimum number of firefighters per shift even if it closed all of its fire stations. Moreover, to meet the minimum staffing requirements, the City asserts that it will be required to employ a certain minimum number of firefighters overall to have enough personnel for each shift, and, in doing so, discounts the IAFF's contention that it can change the length or type of shift to retain overall managerial prerogatives, as the length and type of shift are mandatory subjects of bargaining.

Drawing an analogy, the City contends that minimum shift staffing is no different than a no-layoff clause which is a managerial prerogative. It goes on to note that, not only is bargaining limited to terms and conditions of employment, 43 P.S. § 217.1, but

that decisions regarding the public welfare are properly left in the hands of the municipality that the citizenry authorized to make such decisions, and that holding otherwise would be "contrary to this nation's democratic values." Appellee's Brief at 25.

We begin our analysis by summarizing what is not in contention. First, the IAFF and the City agree that the proper framework is the three-step analysis set forth in *Borough of Ellwood City* and *City of Philadelphia* described above. Again, under this approach, a court should initially determine whether the topic is subject to the right of collective bargaining — i.e., whether it is rationally related to the terms and conditions of employment. If so, the court should consider whether the award also implicates a managerial responsibility. If the topic is both a mandatory subject of bargaining and implicates a managerial responsibility, the final step of the inquiry is "whether collective bargaining over the topic would unduly infringe upon the public employer's essential managerial responsibilities." *Borough of Ellwood City*, 998 A.2d at 600. If unduly infringing upon a managerial responsibility, the topic will be considered a managerial prerogative that is non-bargainable, and, therefore, unable to serve as a component of an interest arbitration award. *Id.*; *City of Philadelphia*, 999 A.2d at 570-71.

Applying this three-step analysis to the matter *sub judice*, the parties are in agreement that mandatory minimum staffing is rationally related to terms and conditions of employment, but also that such a minimum staffing provision implicates managerial responsibilities. Thus, the point of contention between the IAFF and the City is whether the mandatory minimum staffing provision "unduly infringes" upon the municipality's managerial responsibilities. To resolve this question, we first turn to the Commonwealth Court's decisions in *City of Scranton* and *City of Erie*.[10]

---

[10] Neither party asserts that the Commonwealth Court decisions in *City of Scranton* or *City of Erie* were wrongly decided, or calls for their rejection.

In its 1981 decision in *City of Scranton*, the Commonwealth Court was faced with a challenge to an arbitration award that would have mandated the city increase its overall firefighting force to 225 firefighters. The court found the question turned on whether it would allow "members of fire and police forces to decide how much of the municipal budget will be spent in the areas of fire and police protection, under the guise of safety considerations." 429 A.2d at 781. The court determined that this topic was a managerial prerogative, and to uphold the arbitration award would "give the public employees' union the right to have a major decision-making impact on government spending, budgeting, the level of police and fire protection that the municipality must provide, and even taxation, because salaries for the additional employees must come from public funds. To affirm the award of the arbitrator as being within the scope of arbitrable issues, the court must effectively put [the union] on an equal footing with their employer on a major policy-making question." *Id.* In doing so, however, the Commonwealth Court drew "a *very* fine line in distinguishing between the total number of persons on the force (not arbitrable), and the number of persons on duty at a station, or assigned to a piece of equipment, or to be deployed to a fire (all arbitrable because they are rationally related to the safety of the fire fighters)." *Id.* (emphasis original).

Conversely, in *City of Erie*, decided two years later, the Commonwealth Court addressed whether an arbitration award that required a minimum crew of four firefighters on each firefighting rig was proper. The court opined that "[t]he safety of a firefighter is far more rationally related to the number of individuals fighting a fire with him, or operating an important piece of equipment at a fire, than it is to the number of members of the entire force." *City of Erie*, 459 A.2d at 1321 (emphasis deleted). Thus, based upon testimony linking the number of firefighters per rig to impairment of the health and safety of the firefighters, the court upheld the award mandating certain

minimum staffing on each rig, and found a strong correlation between firefighter safety and the number of firefighters responding to a fire.

Because firefighter safety is at the core of our analysis, we also look to the evidence proffered by the parties. The relevant evidence offered by the IAFF at the arbitration hearing concentrated on the relationship between staffing and safety. Specifically, Art Martynuska, President of the Professional Firefighters Association, which is the state affiliate of the IAFF, testified about the concept of fire propagation — that is, the relationship of time and temperature in a fire — and the impact on public and firefighter safety of a quick response and adequate personnel. Arbitration Hearing, 4/22/2013, at 231-33. Martynuska referenced studies linking increased staffing to a decrease in on-the-job injuries and lower workers' compensation claims. *Id.* at 238-39. He spoke to the physical demands placed on firefighters and the resulting health effects, including physical stress placed upon them, especially when understaffed. *Id.* at 242-49. In its most direct terms, Martynuska stressed that "[i]f the number of employees per shift, per piece of apparatus isn't sufficient to do the job appropriately, then its going to cause a safety issue for the firefighters." *Id.* at 249. He continued, "the number of people to complete the task in a timely fashion or timely manner is paramount of importance [sic] . . . . If there's not enough folks to do that, the fire is going to grow. It's going to place our folks in an extreme amount of danger. Tasks will not be completed. If they are completed, they may not be completed appropriately. There's going to be overexertion. There's going to be more injuries on the firemen." *Id.* at 249-50.

This view was echoed by Christian Williams, Fire Captain for the City, who testified that a minimum staffing requirement was important for ensuring enough firefighters to maintain a safe work environment, and that decreasing the number of

firefighters led to unsafe working conditions. Captain Williams offered a historical perspective, including the implementation of certain staffing levels and a corresponding decrease in injuries by approximately 50%, and a more recent increase in injuries due to a drop in staffing levels. *Id.* at 274-80. Finally, Captain Williams offered both specific examples of how lower staffing impacts safety regarding increased firefighter duties and the resultant physical stress on the firefighter, *id.* at 281, as well as examples of how lower staffing levels impacted firefighter safety at particular fires. *Id.* at 285-90.

The City's evidence regarding mandated shift staffing was more limited, primarily focusing on how overtime resulting from minimum staffing was increasing pension expenses for the City. Specifically, the City offered the testimony of Vijay Kapoor, Director of Public Financial Management's Workforce Consulting. Kapoor testified that minimum manning and sick leave impacted overtime, and that overtime increased pension benefits, which in turn placed an acute financial strain on the City, and became a primary issue of contention at the arbitration hearing. Arbitration Hearing, 11/10/2011*,* at 14-15. Kapoor, "try[ing] to explain some of the reasons for what is really driving the overtime," correlated an over 100% increase in overtime since 2005 with an increase in "minimum manning requirements" from 26 in 2005 to 30 in 2010. *Id.* at 67-68. Kapoor offered that the increased growth in overtime was partly due to the number of individuals scheduled to be on a shift, and, specifically, because absences of scheduled individuals, due to vacation or sick leave, required other firefighters to work, thereby increasing overtime. *Id.* at 68-69. According to Kapoor, arbitration awards involving other cities of the third class (like Allentown) in Pennsylvania eliminated or significantly scaled back mandatory shift staffing requirements. *Id.* at 92-93.

Based upon the above decisional law and evidence of record, we note that, under *Borough of Ellwood City*'s analytical construct, the resolution of the question of

whether mandatory shift staffing unduly infringes on a managerial responsibility falls between questions regarding total force staffing and those involving minimum staffing of firefighting equipment.

On this question, we find there is a direct and significant relationship between the number of individuals available to respond to a call at a station — minimum shift staffing — and the safety of the City's firefighters. The testimony and documentary evidence from the arbitration proceedings set forth in detail above clearly establishes an unambiguous and powerful link between shift staffing and firefighter health and safety. The City's proffer regarding how such a provision unduly infringes upon its managerial responsibilities is only tangential in nature, and largely relates to how overtime costs due to minimum staffing provisions negatively impacts the City's pension burden. Accordingly, we conclude that shift staffing mandates are more akin to the mandates regarding the staffing of firefighting apparatus than the staffing of the entire fire department. *Compare City of Erie with City of Scranton.* While we are acutely aware of, and sensitive to, the significant financial challenges facing the City and other cities in our Commonwealth, we conclude that the City has not demonstrated that a minimum staffing requirement unduly infringes upon the City's managerial responsibilities in the same manner, or to the same extent, that budgeting or overall staffing mandates might in light of the impact of staffing on firefighter safety.

While certainly implicating managerial responsibilities, the relevant inquiry is whether the mandatory shift staffing *unduly* infringes upon those rights. Simply stated, the City has not met its burden in this regard. Indeed, under that mandate, the City is not required to employ a definite number of firefighters, but may meet minimum mandates through overtime and fire company closures. Even with minimum shift staffing, the City retains the ability to dictate the level of fire protection it provides to its

citizens and continues to possess ultimate decision-making regarding budgetary matters. Finally, we note that this mandate was not cast in stone, as the new agreement by its terms expired in December 2015, and the parties at that juncture were able to re-negotiate this issue.

Ultimately, we conclude that a minimum shift staffing mandate, given its direct and significant impact on firefighter health and safety, is simply not a managerial prerogative that should be insulated from the give-and-take of collective bargaining. *Borough of Ellwood City*, 998 A.2d at 599-600.

The concurrence by Chief Justice Saylor voices two primary areas of concern regarding our resolution of the issue before us. First, the concurrence eschews any broad legal determination regarding whether minimum shift staffing is a mandatory subject of bargaining and, thus, may be a component of an interest arbitration award; instead, the concurrence would find such determinations to be circumstantial/fact-sensitive and to be decided solely on a case-by-case basis. In support thereof, the concurrence offers the specter of a small city being adversely affected by an arbitration panel's award that impacts its prerogative vis-à-vis the total size of the firefighting force. Second, and related thereto, the concurrence advocates an approach which would give great deference to the arbitration panel, specifically, in this instance, with respect to the panel's conclusions regarding unfunded pension liability. Thus, under the concurrence's fact-determinative approach, if the minimum shift staffing number required by an arbitration panel impacted the overall firefighting complement or failed to resolve significant unfunded pension liability issues, that topic would not be considered to be a subject of bargaining and could not be part of an arbitration award.

The difficulty with the concurrence's analytical construct is two-fold. First, a judicial determination of whether a topic is negotiable is typically a broadly applicable

legal conclusion. This conclusion, of course, may be reached with foundational factual support, such as here, where we have necessarily found, based upon the evidence of record, a direct and significant relationship between shift staffing and firefighter safety which serves as the basis for our accompanying conclusion that bargaining over this safety issue does not unduly burden a municipality's managerial responsibilities.

Nevertheless, as noted above, ultimately, we are attempting to discern the legislature's intent regarding the rights and duties of municipal employers and unions regarding collective bargaining — more specifically, we are attempting to discern what are the proper subjects of bargaining, managerial responsibilities, and managerial prerogatives. As the General Assembly did not offer a statutory standard for the courts to employ in deciding what arbitration awards are consistent with the scope of collective bargaining in Act 111 and which awards fall outside of those permissible topics, it falls upon this Court to make those determinations. *See City of Philadelphia*, 999 A.2d at 571. More pointedly, in analyzing what topics are managerial responsibilities, administrative agencies and courts are called upon to determine what matters are insulated from the give and take of collective bargaining and are more appropriately vested in a municipalities' discretion. Determining whether bargaining over a certain subject unduly burdens a municipality's managerial responsibilities, and, thus, constitutes a managerial prerogative, is akin to questions regarding mandatory subjects of bargaining and managerial responsibilities, differing only to a matter of degree, and in many respects constitutes a policy-based determination. *See Borough of Ellwood City*, (recognizing that, under Act 111, matters that are managerial in nature and implicate significant policy concerns are not subject to collective bargaining); *City of Philadelphia*, 999 A.2d at 570 (construing Act 111 to allow bargaining over managerial prerogatives

would give a "select few the right to participate in decisions that have far-reaching political and economic implications for an entire community").

Thus, viewed from this perspective, the concurrence is correct that our legislature (and courts) have allowed for the development of what constitute mandatory subjects of bargaining on a case-by-case basis — via decisional law. Yet, in our view, the concurrence takes this concept too far, by further suggesting that each and every case will have unique circumstances and facts rendering judicial conclusions regarding subjects of bargaining to be wholly *sui generis* and limited to the parties to the appeal. Such a circumstantial/fact-driven, non-precedential approach is both inconsistent with our prior Commonwealth's precedent and contrary to sound labor policy.

For example, in our seminal decision in *Township of Moon v. Police Officers of the Township of Moon*, 498 A.2d 1305 (Pa. 1985), in determining whether a residency requirement was a proper subject of bargaining or a managerial prerogative, our Court expressly relied upon prior precedent in determining a residency requirement was a proper subject for an interest arbitration panel:

> We are of the view that the Commonwealth Court's decision holding that residence as a requisite for application to or membership in a police department clearly is a condition of employment within the meaning of section 1 of Act 111, *Cheltenham Township v. Cheltenham Police*, *supra*, cannot be seriously questioned. Residency requirements have traditionally been considered as a term or condition of employment and therefore an appropriate subject for collective bargaining. Nor are we persuaded that the uniqueness of the relationship of fire and police personnel with their public employer is a relevant factor to warrant a change in this conclusion.

*Moon Township*, 498 A.2d at 1313 (citations omitted).[11]

Thus, once an appellate court renders a decision with respect to a discrete subject, that conclusion, generally speaking, will apply to other employers and unions and tribunals.[12] *See*, *e.g.*, *Schuylkill Haven Borough v. Schuylkill Haven Police Officers Association*, 914 A.2d 936, 941 (Pa. Cmwlth. 2006) ("One area that has consistently been recognized as an inherent management prerogative is the total number of police officers or firemen that a municipality desires to employ."); *id.* at 943 ("[N]otwithstanding . . . language [contained in the Police Pension Fund Act], pension obligations have always been the subject of collective bargaining."). While certainly a categorical difference in circumstances may suggest a different conclusion or an exception to a determination regarding bargainability, our Court's conclusions with respect to subjects

---

[11] *Cf. id.* at 1311-12 (specifically relying upon prior precedent in determining whether an arbitration panel had the authority to include in its award a grievance dispute mechanism: "Our case law also makes it clear that this was a proper subject for consideration by an interest arbitration panel. . . In [*Chirico v. Board of Supervisors for Newton Township*, 470 A.2d 470 (Pa. 1983)] we expressly held that under Act 111 that arbitration is the proper forum for resolution of grievance disputes involving the interpretation of a provision of an arbitration award. We have been shown no controlling precedent nor have we been offered any impressive arguments why we should establish an exception which would prevent an arbitration panel from establishing a grievance arbitration procedure as part of the contract it develops for the parties. . . We therefore rely upon the above cited precedent in holding that the arbitration panel could properly include in its award a mechanism for binding arbitration of grievances and disputes arising under the terms of the collective bargaining provisions set forth under its award." (emphasis added)).

[12] The concurrence suggests that our judicial determinations should not be accepted as broader legal determinations regarding subjects of bargaining, as "a topic's bargainability as a categorical matter depends upon the fortuity of how severely managerial responsibilities and firefighter safety are affected in the first controversy to reach this Court." Concurring Opinion (Saylor, C.J., concurring) at 6 n.4. Yet, review of the "first controversy" to reach our Court is how many, if not most, of the issues before our Court are resolved. Moreover, the purely fact-driven approach proffered by the concurrence, as noted below, will result in continual litigation and the substantial erosion of the narrow *certiorari* standard of review.

of bargaining, managerial responsibilities, and managerial prerogatives have in the past served, and should serve, as the precedent upon which future disputes should be resolved.[13]

Furthermore, if disputes regarding bargainable topics were truly *sui generis* in nature, our Court's precedent would have little value, again, undermining the goal of labor harmony and, thus, negatively affecting the field of labor relations in numerous ways. Judicial determinations as to the proper subjects of bargaining are meant to be broadly applicable so as to bring predictability and stability to labor relations, which was the primary motivation for the original passage of Act 111. *See Borough of Ellwood City*; *City of Philadelphia*. Indeed, the concurrence's course would tend to *destabilize* labor relations, as every negotiation, and every Act 111 arbitration award hearing, could devolve into a re-litigation of the issue of whether, for example, shift staffing is a negotiable topic. This, in turn, could lead to incongruous results — a topic subject to negotiation in Allentown could be determined to be a managerial prerogative in Wilkes-Barre. Moreover, and perhaps more peculiar, the status of minimum shift staffing as a subject of bargaining (or a managerial prerogative) might change with every round of bargaining even between the same union and municipality. This is simply not how determinations regarding subjects of bargaining generally operate in labor relations — nor should they if the goals of predictability and stability are to be achieved.

---

[13] Suggesting such an approach is outside the mainstream, the concurrence offers various foreign state decisions which seemingly embrace a circumstance-specific approach to determining subjects of bargaining. Yet, it is not clear these states share a similar statutory framework, deferential standards for judicial review, or a similar labor history. Indeed, public sector labor relations, unlike the federal approach in the private sector, is distinctly governed by state law, allowing for an individualized approach to labor relations in each state. In any event, it is our Commonwealth's judicial decisions which are most relevant for purposes of issues arising in Pennsylvania.

In the same vein, interest arbitration awards were intended by the legislature to be final and binding. *See* 43 P.S. § 217.7(a). While the concurrence presses for deference to arbitrators in such decisions, allowing our Court's determinations regarding the subjects of bargaining to be relegated to fact-driven *sui generis* decisions, without any precedential value beyond the immediate parties to the appeal, not only subverts our significant role under narrow *certiorari* review with respect to the legality of an arbitration award, as noted above, but as a practical matter will embolden parties to challenge an adverse award, resulting in an increase in the number of appeals to the courts, undermining the finality and time-sensitive nature of the awards, contrary to the intent of the legislature.

Finally, challenges regarding mandatory subjects of bargaining and managerial prerogatives are often brought when a party refuses to negotiate and through the vehicle of an unfair labor practice charge, without the benefit of a specific arbitration award. *See Borough of Ellwood City*. Thus, the approach of resolving these matters by giving great deference to an arbitration panel, to be determined on a case-by-case basis, will not always be viable.

The second difficulty with the concurrence's approach is that, seemingly, the concurrence's apprehension is not that the topic of mandatory shift staffing is subject to negotiation and possibly arbitration (indeed, it concurs in this proposition), but, rather, concerns the possibility of a future rogue arbitration award — one that effectively mandates an increase in overall force size due to an excessive minimum shift size, or one that ignores the impact of minimum staffing on unfunded pension liability.

Specifically, the concurrence accepts that the minimum shift size of 25 firefighters for Allentown may be a subject of the arbitration award, but takes the position that, for a smaller municipality, where a minimum shift size may affect the

overall size of a firefighting force, it would not be a proper subject of bargaining. In addition, the concurrence embraces the arbitration panel's award in this instance because it "acknowledged the untenable state of the City's pension fund and made adjustments to the minimum shift size and method for pension calculations." Concurring Opinion (Saylor, C.J., concurring) at 4. The concurrence's approach, however, requires resolution of objections to specific arbitration awards, and so raises qualitatively different issues than the question before us. The concurrence's concerns should not be resolved by transforming threshold questions of bargainability into detailed fact-specific inquiries based upon arbitration awards.

By way of explanation, if an arbitration panel orders a minimum shift size equal to or in excess of the municipality's overall force, then it would seemingly mandate an increase in that overall firefighting force, and, thus, implicate a question has been held by the Commonwealth Court to be a managerial prerogative. *City of Scranton*. Thus, under the Commonwealth Court's precedent, such an award could be reviewed as being outside the arbitrator's authority. If an arbitration award mandating a minimum shift size did not require a change in the overall force but had other undesirable effects, such as placing an undue burden on a municipality with respect to unfunded pension liability, the challenge would not be to whether such was a topic of bargaining, as proposed by the concurrence here, but to the merits of the award, which would be reviewed under the narrow *certiorari* standard — no different than, for example, a claim that an arbitration award gave firefighters too large a wage increase negatively impacting unfunded pension liability. Of course, under narrow *certiorari*, such review, as noted above, is extremely limited. By intertwining threshold questions of bargainability with a fact-based merits review of the impact of that bargaining on, for example, the financial health of a municipality and pension matters, as proffered by the

concurrence, the concurrence's approach would change the essential nature of narrow *certiorari* review. If the concurrence is, in essence, looking for a safety valve to correct the merits of a wayward arbitration award, it would seemingly necessitate a re-examination of that highly deferential standard; however, that issue is not before us in the current appeal.

One final point of clarification: Contrary to the concurrence's indication, we are not suggesting that no changes in personnel management will be required to meet minimum shift staffing requirements. Rather, we are simply offering that staffing minimums here do not *ipso facto* dictate the overall complement of the City's firefighting force. Such changes in personnel management, even if necessary, might include the City offering employees greater overtime opportunities, increasing mandatory shift length, greater use of part-time employees, or closing firehouses to increase the number of firefighters available to meet minimum shift staffing at the remaining firehouses.

In conclusion, we hold that the subject of mandatory shift staffing constitutes an arbitrable issue that may serve as part of an Act 111 interest arbitration award, and that the arbitration panel in this matter did not exceed its powers in imposing such a provision in its award. Thus, for all of the above reasons, we reverse the order of the Commonwealth Court.

Jurisdiction relinquished.

Justices Baer, Wecht and Mundy join the opinion.

Chief Justice Saylor files a concurring opinion in which Justice Donohue joins.

Justice Dougherty files a concurring opinion in which Justice Donohue joins.