Appropriate Orders will issue.

BY THE COURT:

/s/ Samuel M. Lehrer
SAMUEL M. LEHRER, J.
3/29/95

**BOROUGH OF GEISTOWN, Petitioner,**

**v.**

**PENNSYLVANIA LABOR RELATIONS BOARD, Respondent.**

Commonwealth Court of Pennsylvania.

Argued March 12, 1996.

Decided May 7, 1996.

Publication Ordered July 16, 1996.

Alex E. Echard, for Petitioner.

Peter Lassi, for Respondent.

Christian A. Fisanick, for Intervenor, Geistown Borough Police Wage & Policy Committee.

Before DOYLE and FRIEDMAN, JJ., and NARICK, Senior Judge.

DOYLE, Judge.

The Borough of Geistown (Borough) appeals an order of the Pennsylvania Labor

1.  Section 4(a) of Act 111, 43 P.S. § 217.4(a), provides:
    (a) If in any case of a dispute between a public employer and its policemen or firemen employees the collective bargaining process reaches an impasse and stalemate, or if the appropriate lawmaking body does not approve

Relations Board (PLRB), which determined that the Borough engaged in unfair labor practices when, after an impasse was reached in negotiations with its police department concerning a new collective bargaining agreement and the Geistown Borough Police Wage and Policy Committee (Union) requested interest arbitration, the Borough did not proceed to arbitration and subcontracted its police services.

The PLRB's findings of fact may be summarized as follows. The Borough and the Union were parties to an interest arbitration award that was effective until December 31, 1993. On February 17, 1993, the Union requested the Borough to commence negotiations for a new collective bargaining agreement (CBA). After protracted discussions with the Borough over whether the Union was requesting an informal fact-finding meeting or negotiations, the Union, on June 14, 1993, informed the Borough that it desired collective bargaining for a new CBA. The Borough hired a consultant, Robert Mitchell, to negotiate a new CBA with the Union. While the Borough was considering subcontracting its police responsibilities as early as June 1993, Mitchell was directed by the Borough not to negotiate with the Union over that issue.

On September 8, 1993, the Union determined that an impasse in the negotiations had occurred and sent the Borough a Notice for Binding Arbitration and a Notice of Arbitrator Selection as provided for by the Act of June 24, 1968, P.L. 237, *as amended,* 43 P.S. §§ 217.1–217.10 (Act 111).[1] During a negotiation session held subsequent to the Union's demand for arbitration, a Borough councilman warned the Union representative that "if you proceed with Act 111 arbitration, we are going to contract services." (Finding of Fact No. 14, Decision PLRB Hearing Examiner.) The Union filed an unfair labor prac-

the agreement reached by collective bargaining, with the result that said employers and employees are unable to effect a settlement, then either party to the dispute, after written notice to the other party containing specifications of the issue or issues in dispute, may request appointment of a board of arbitration.

tices charge with the PLRB on November 2, 1993, alleging that the Borough was in violation of Act 111 for failing to select an arbitrator and proceed to arbitration. The Borough selected an arbitrator on November 10, 1993.

In December of 1993, the Borough, aware that a CBA could not be negotiated and that arbitration would be necessary, began to receive bids from other municipalities for police services and notified the Union of that fact. Prior to December 2, 1993, the Borough never raised at the bargaining table the issue of purchasing outside police services. During negotiations in mid-December of 1993, the Borough told the Union that it could bid on providing police services but that the bid had to include janitorial services and vehicle maintenance. On December 30, 1993, the Borough enacted an ordinance disbanding its police department and authorizing the Borough to contract for police services. On or about December 30, the Borough entered into a contract with Richland Borough to provide it with police services, and Richland Borough began patrolling Geistown Borough on January 1, 1994.

The Union filed a second unfair labor practice charge against the Borough, asserting the Borough had violated Sections 6(1)(a), (c), (d) and (e) of the Pennsylvania Labor Relations Act (PLRA)[2] and Act 111. The PLRB

issued a complaint and notice of hearing and the case was submitted to a hearing examiner. Hearings were conducted on November 16, 1994 and February 1, 1995.

The hearing examiner issued a proposed decision holding that the Borough committed unfair labor practices under Section 6(1)(a), (c), (d) and (e) of the PLRA and Act 111. Specifically, the hearing examiner found that the Borough committed two unfair labor practices: (1) the Borough unilaterally implemented the subcontract with Richland Borough prior to proceeding to interest arbitration; and (2) the subcontract was executed to retaliate against the Union for proceeding to interest arbitration and for anti-union animus. The hearing examiner ordered the Borough to restore the status quo ante by, *inter alia*, directing the Borough to rescind the contract with Richland Borough, reinstate its police officers, and provide the police officers with back pay. The Borough filed exceptions to the hearing examiner's decision, which the PLRB dismissed. This appeal followed.

■ On appeal, the Borough contends that it properly contracted out its police services without committing an unfair labor practice. While, the Borough's brief is a rather rambling hodgepodge of facts and law,[3] we have discerned from its brief the following argu-

---

**2.** Act of June 1, 1937, P.L. 1168, *as amended*, 43 P.S. § 211.6(1)(a), (c), (d), and (e). Section 211.6(1) of PLRA provides:

(1) It shall be an unfair labor practice for an employer—

(a) To interfere with, restrain or coerce employees in the exercise of the rights guaranteed in this act.

. . . .

(c) By discrimination in regard to hire or tenure of employment, or any term or condition of employment to encourage or discourage membership in any labor organization: Provided, That nothing in this act, or in any agreement approved or prescribed thereunder, or in any other statute of this Commonwealth, shall preclude an employer from making an agreement with a labor organization (not established, maintained or assisted by any action defined in this act as an unfair labor practice) to require, as a condition of employment, membership therein, if such labor organization is the representative of the employees, as provided in sec-

tion seven (a) of this act, in the appropriate collective bargaining unit covered by such agreement when made and if such labor organization does not deny membership in its organization to a person or persons who are employees of the employer at the time of the making of such agreement, provided such employe was not employed in violation of any previously existing agreement with said labor organization

(d) To discharge or otherwise discriminate against an employe because he has filed charges or given testimony under this act.

(e) To refuse to bargain collectively with the representatives of his employees, subject to the provisions of section seven (a) of this act.

. . . .

**3.** The statement of questions presented on page 3 of the brief is so broad that it does not define any specific issue.

ments: (1) the Borough was permitted to subcontract police services without proceeding to interest arbitration because it took legislative action to abolish its police department; (2) the Union, not the Borough, intentionally delayed interest arbitration; and (3) the Borough contracted out its police services for legitimate business reasons, not in retaliation or anti-union animus.[4]

Under Section 4 of Act 111, when the bargaining unit and public employer reach an impasse, either party may request the appointment of an interest arbitration panel. When either the public employer or the bargaining unit refuses to proceed to arbitration under Section 4 of Act 111, the party obstructing arbitration commits an unfair labor practice in violation of the PLRA. *Borough of Nazareth v. Pennsylvania Labor Relations Board,* 534 Pa. 11, 626 A.2d 493 (1993). Further, a public employer commits an unfair labor practice if it transfers any bargaining unit work to non-members without bargaining over the issue. *City of Harrisburg; County of Bucks v. Pennsylvania Labor Relations Board,* 77 Pa.Cmwlth. 259, 465 A.2d 731 (1983).

The Borough asserts that it did not commit an unfair labor practice by not proceeding to interest arbitration because it exercised its legislative power to abolish its police department and subcontract its police services. This issue, however, was not raised in the Borough's exceptions to the hearing examiner's proposed decision. Therefore, we hold that it is waived. 34 Pa.Code § 95.98(a)(3). However, even if this issue was preserved for our review, it would fail.

Section 4 Act 111, a state statute, mandates arbitration when an impasse is reached and arbitration is requested by one of the parties. *Borough of Nazareth.* The Borough, however, has no power to enact ordinances which are contradictory or inconsistent with a state statute. *Rural Area Concerned Citizens, Inc. v. Fayette County Zoning Hearing Board,* 166 Pa.Cmwlth. 520, 646 A.2d 717 (1994), *petition for allowance of appeal denied,* 540 Pa. 636, 658 A.2d 798 (1995). Moreover, in *County of Bucks* we held that a public employer could not *"under any guise"* avoid its Act 111 duty to bargain. *Id.,* 465 A.2d at 734. We believe that a local ordinance may not be used as a "guise" by the Borough to sidestep Act 111 and transfer work from the Union to non-members. Therefore, we hold that the Borough could not defeat the requirements of Act 111 and avoid its duty to proceed to interest arbitration by enacting an ordinance disbanding its police force and contracting with Richland Borough to provide it police services.[5]

Relative to the preceding discussion, the Borough asserts that once an impasse was reached, it was free to unilaterally subcontract its police services and avoid interest arbitration. This argument, however, is contrary to the plain language of Section 4 of Act 111, which provides that once an impasse is reached any party may request arbitration, and that arbitration is the *mandatory,* exclusive remedy. *Borough of Nazareth; Borough of New Cumberland v. Police Employees of the Borough of New Cumberland,* 51 Pa.Cmwlth. 435, 414 A.2d 761 (1980). There is no authority holding that an impasse allows a public employer to refuse to proceed to interest arbitration under Act 111 and

---

4. Our scope of review of an order of the PLRB is limited to determining whether constitutional rights were violated, an error of law was committed, or whether necessary findings of fact are supported by substantial evidence. *City of Harrisburg v. Pennsylvania Labor Relations Board,* 146 Pa.Cmwlth. 242, 605 A.2d 440 (1992).

5. *Compare Youngwood Borough Police Department v. Pennsylvania Labor Relations Board,* 114 Pa.Cmwlth. 445, 539 A.2d 26 (1988), *petition for allowance of appeal denied,* 522 Pa. 599, 562

A.2d 323 (1989). In that case, we held that Youngwood Borough could abolish its police department and allow the Pennsylvania State Police, under their own statutory obligations, to provide police services to its citizens. We also held, however, that the Youngwood Borough committed an unfair labor practice by directing other persons to perform certain duties previously performed by the police. Hence, under *Youngwood* the Borough's decision to abolish its police department and then contract with Richland Borough to perform those services constituted an unfair labor practice.

then transfer bargaining unit work to non-members. The PLRB correctly notes in its brief that such a holding would deny Act 111 employees both the right to strike *and* the right to compel arbitration; the Legislature did not intend that result. Hence, when the impasse occurred, the Borough could not ignore the Union's request for arbitration or its obligations under Act 111 and take unilateral action to subcontract out its police services.

■ The Borough also contends that the Union intentionally delayed the arbitration proceedings and did not proceed to arbitration in a timely manner. The PLRB, in its decision, properly resolved this argument as follows:

> The Borough contends that the Union ... failed to timely exercise its right to interest arbitration. However, the Union requested arbitration on September 8, 1993, which was more than 110 days before the start of the Borough's 1994 fiscal year (which commenced on January 1, 1994). Therefore, the Union's request for arbitration was timely under Section 3 of Act 111[6].... (Citations omitted.)

> ....

> We find no support ... for the Borough's claim that the Union did not actually desire to proceed to binding interest arbitration. The Union simultaneously advised the Borough of its demand for interest arbitration and of its selection of its arbitrator. After the Borough failed to appoint its arbitrator within five days as required by Section 4 of Act 111, the Union filed an unfair labor practice charge .... to compel the Borough to appoint its arbitrator and proceed to arbitration. The Borough did not appoint its arbitrator until November 10, 1993, which was more than two months after the Union requested arbitration. Thus, the Borough itself caused substantial delay in the arbitration process. Moreover, when the Borough finally appointed its arbitrator, the parties were

engaged in negotiations for a collective bargaining agreement which continued into December 1993, when Borough Council voted to subcontract police services....

(PLRB Decision at 4–5.) The Borough did not challenge any of these findings of fact relied on by the PLRB as unsupported by substantial evidence. Those facts amply demonstrate that the Borough, and not the Union, delayed the arbitration process. Therefore, this argument of the Borough is without merit.

■ Last, the Borough argues that it did not subcontract its police services because of anti-union animus and a desire to retaliate against the Union for requesting interest arbitration. The PLRB concluded that the Borough subcontracted its police services to retaliate against the Union based on the following relevant facts: (1) a Borough Councilman told the Union that, if it proceeded to arbitration, the Borough was going to contract out its police services and the Borough ultimately did so; (2) the Borough deprived its negotiator of the power to address the issue of subcontracting; (3) the Borough reduced the police budget from $131,000 to $110,000, the amount of Richland Township's bid; and (4) the Borough was not economically distressed, ended fiscal year 1993 with a balance of over $100,000, and had no economic difficulties for three years before the subcontract. The PLRB's hearing examiner also rejected the testimony of three Borough Council members, whose testimony was conflicting on the issue of the reason for reducing the police budget, and determined that their justifications for that reduction were a pretext for their desire to subcontract police services.

The Borough, however, asserts that it elected to subcontract its police services for legitimate economic and business reasons. Specifically, the Borough points to the testimony of certain Council members who explained that there were various business and economic reasons for reducing the police budget. The Borough also claims that the

6. 43 P.S. § 217.3.

subcontract would save the Borough money, demonstrating that the Borough decision to subcontract was made in good faith. In addition, the Borough argues that there are legitimate non-economic reasons for its decision to subcontract, namely, that the police department was an "embarrassment" to the Borough because of citizen complaints and an investigation into contraband drugs found in the municipal building.

The PLRB is permitted to draw inferences of unlawful motive from the facts, *City of Reading v. Pennsylvania Labor Relations Board,* 130 Pa.Cmwlth. 397, 568 A.2d 715 (1989), and the Borough is not challenging any of the PLRB's relevant findings of fact as unsupported by substantial evidence. Most important, the Borough does not argue that the PLRB's finding that a Councilman threatened to subcontract police services if the Union insisted on proceeding to arbitration is unsupported by substantial evidence. That finding, coupled with the fact that the Borough actually subcontracted out its police services, provides sufficient support for the PLRB's conclusion that the Borough had an anti-union animus and retaliated against the Union for demanding arbitration. *Id.* Therefore, the PLRB and the hearing examiner reasonably inferred from the facts that the Borough retaliated against the Union and had an anti-union animus.

Further, the Borough's claim that it had valid economic and non-economic reasons for subcontracting out its police work was rejected by the hearing examiner. Specifically, the examiner rejected the testimony of the Council members regarding the reasons for reducing the police budget, concluding that their explanations were a pretext for the Borough's desire to subcontract out its police work.[7] This Court will not reverse the PLRB's credibility determinations and make new findings of fact supporting the Borough's position. *Pennsylvania Labor Relations Board v. Fabrication Specialists, Inc.,* 477 Pa. 23, 383 A.2d 802 (1978). Even assuming the Borough could save money by

subcontracting out its police work, economic savings alone does not establish that a public employer does not have an anti-union animus. *See Commonwealth v. Pennsylvania Labor Relations Board,* 130 Pa.Cmwlth. 426, 568 A.2d 730 (1990) (Commonwealth's decision to unilaterally subcontract bargaining unit work to reduce the cost of providing laundry services, even where no employees were furloughed, was an unfair labor practice under Section 1201 of the Public Employe Relations Act, Act of July 23, 1970, P.L. 563, *as amended,* 43 P.S. § 1101.1201), *petition for allowance of appeal denied,* 527 Pa. 625, 592 A.2d 46 (1991). The issue of whether citizen complaints about the police department and the contraband investigation show that the Borough had a legitimate reason to subcontract its police services was not raised in the Borough's exceptions from the hearing examiner's decision and is likewise waived.

Accordingly, the PLRB's order is affirmed.

### ORDER

NOW, May 7, 1996, the order of the Pennsylvania Labor Relations Board in the above-captioned matter is hereby affirmed.

---

**7.** The Borough also argues that the PLRB improperly required it prove that it was economically distressed before it could subcontract out its police services. Our review of record shows that the PLRB never required the Borough to

prove that it was economically distressed. Instead, the PLRB merely rejected the Borough's economic defense to the unfair labor practices charge.