IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Allegheny County Prison Employees     :
Independent Union,     :
    :
Petitioner     :
    :
v.     : No. 1139 C.D. 2023
    : Argued: October 8, 2024
Pennsylvania Labor Relations Board,     :
    :
Respondent     :

BEFORE:    HONORABLE ANNE E. COVEY, Judge
           HONORABLE MICHAEL H. WOJCIK, Judge
           HONORABLE STACY WALLACE, Judge

OPINION BY JUDGE WOJCIK            FILED: May 30, 2025

Allegheny County Prison Employees Independent Union (Union) petitions for review of the September 19, 2023 final order of the Pennsylvania Labor Relations Board (PLRB), which dismissed the Union's exceptions to a Hearing Examiner's proposed decision and order (PDO). The PDO concluded that Allegheny County (County) did not commit unfair labor practices (Unfair Practices) in violation of Section 1201(a)(1) and (5) of the Public Employe Relations Act (PERA)[1] when it passed an Ordinance by a referendum on May 18, 2021, requiring

---

[1] Act of July 23, 1970, P.L. 563, *as amended*, 43 P.S. §1101.1201(a)(1), (5). Section 1201 of PERA provides in pertinent part:

> (a) Public employers, their agents or representatives are prohibited from:
>
> (1) Interfering, restraining or coercing employes in the exercise of the rights guaranteed in Article IV of this act.

* * *

**(Footnote continued on next page…)**

the Allegheny County Jail (Jail)[2] to implement new policies regarding solitary confinement and the use of leg chains and oleoresin capsicum (pepper spray). The Union primarily argues that the PLRB erred by considering these policies to be within the scope of the Jail's managerial prerogatives rather than the subject of collective bargaining. For the following reasons, we affirm.

## I. Background

On May 18, 2021, County voters approved a ballot initiative pertaining to the use of solitary confinement and certain "use of force" mechanisms within the Jail. PDO, 11/2/22, Findings of Fact (F.F.) at 4. The ballot initiative provided: "Shall the [County's administrative code] be amended and supplemented to include a new Article III . . . which shall set forth standards governing conditions of confinement in the [Jail]?" *Id.* The approved changes prohibited solitary confinement, defined as detaining an inmate alone for more than 20 hours per day, and the use of leg chains, restraint chairs, and pepper spray. *Id.* Upon approval, the ballot initiative became an Ordinance and afforded the Jail's Warden six months to enact new policies in compliance therewith. *Id.* at 5.

While the Jail does not nominally have a solitary confinement wing in its facility, the Ordinance's definition of solitary confinement impacted its policies

---

> (5) Refusing to bargain collectively in good faith with an employe representative which is the exclusive representative employes in an appropriate unit, including but not limited to the discussing of grievances with the exclusive representative.

43 P.S. §1101.1201(a)(1), (5).

[2] For ease of discussion, we will refer to the Jail as the public employer rather than the County.

regarding the care of its inmates in its Restrictive Housing Unit (RHU) as well as its "Informal Resolution Policy." PDO at F.F. Nos. 7-8. Prior to the adoption of the Ordinance, the RHU housed dangerous inmates separate from the general inmate population and only permitted those inmates to have one hour of recreation per day. *Id*. at F.F. Nos. 6, 7. To obtain compliance with the Ordinance, the Jail began permitting inmates in the RHU to have four hours of recreation per day. *Id*. The Jail's "Informal Resolution Policy," however, was used to discipline inmates in the general population. PDO at F.F. No. 8. The policy permitted corrections officers (COs) to discipline inmates for "minor rule infractions" by, *inter alia*, confining an inmate in his or her cell for various periods of time, running from 4 hours to 72 hours. *Id*. If the punishment exceeded 24 hours of confinement, the inmate would be permitted one hour of recreation. *Id*.

The Hearing Examiner did not detail the differences in the Jail's former policies concerning the use of leg chains, pepper spray, or restraint chairs and its new implemented policy. Per the PDO, the Warden simply forbade the use of the same. *See* PDO at F.F. No. 5.

On July 2, 2021, the Union filed a Charge of Unfair Practices with the PLRB, asserting that the County violated Section 1201(a)(1) and (5) of PERA by failing to implement these new policies by way of collective bargaining. PLRB Decision at 2. The Secretary of the PLRB subsequently dismissed the Union's Charge of Unfair Practices. The Union filed exceptions to the dismissal, prompting the PLRB to remand for further proceedings, including a hearing that was conducted on April 26, 2022. *Id*.

In a PDO circulated on November 2, 2022, the Hearing Examiner dismissed the Union's Charge. The Hearing Examiner rejected the Union's

argument that the County committed unfair practices under PERA by certifying an Ordinance inconsistent with PERA's provisions. PDO at 6. Rather, the Hearing Examiner viewed the policy changes mandated by the Ordinance as inherently managerial, such that neither the County nor the Jail unilaterally altered policies that were rightly the subject of mandatory bargaining. *Id*. (citing *Pennsylvania Labor Relations Board v. Mars Area School District*, 389 A.2d 1073 (Pa. 1978); *Pennsylvania Labor Relations Board v. State College Area School District*, 337 A.2d 262 (Pa. 1975) (*State College*)).

Because a jail's inherent managerial prerogative includes the care, custody, and control of its inmates, the Hearing Examiner did not view the changes to the Jail's solitary confinement policy as necessitating bargaining. PDO at 6. Instead, the Hearing Examiner found that the amount of recreation time afforded to each inmate was "manifestly an issue relating to the care, custody, and control of its inmates." *Id*. at 7. Likewise, the Hearing Examiner rejected the Union's argument that increased recreation time would increase the risk of injury to COs and inmates, thereby implicating bargaining under Section 701 of PERA,[3] 43 P.S. §1101.701. PDO at 7. The Hearing Examiner specifically found that "[o]n its face, the policy has nothing to do with CO safety" but simply relates to inmate recreation. Nor did the Hearing Examiner agree with the Union that there was any observable impact on a CO's health, safety, or other term of employment. PDO at 8.

Next, the Hearing Examiner rejected the Union's contention that the Jail did not have sufficient staffing to monitor inmate recreation for four hours per day. PDO at 8. In his view, the Ordinance squarely targeted inmate recreation time

_____

[3] Public employers have the mandatory duty to "meet at reasonable times and confer in good faith with respect to wages, hours and other terms and conditions of employment . . . ." Section 701 of PERA, 43 P.S. §1101.701.

4

rather than a CO's conduct. Despite recognizing that the COs were necessarily affected by the Ordinance, the Hearing Examiner concluded that the Union's concerns were "overly general, conclusory, and speculative." *Id*. at 9.

> Almost any policy promulgated by the Jail which deals with the inmates could remotely impact officer safety in some arguable way as the COs deal with the inmates every day in close proximity. However, it is not the aim of PERA or [PLRB] policy for public unions to be co-managers of the workplace and hold all policy in the grip of collective bargaining.

*Id*. Applying the *State College* test, the Hearing Examiner stated that even if the Union's interest in CO safety was implicated, then the County's interest in the care, custody, and control of its inmates outweighed it. *Id*. at 10.

Finally, concerning the prohibition of leg chains, pepper spray, and restraint chairs, the Hearing Examiner, relying on the PLRB's own precedent, expressed that this prohibition was simply a matter of the Jail's right to direct its personnel as a "use of force" policy. PDO at 10 (citing, *e.g.*, *Fraternal Order of Police Lodge, No. 5 v. City of Philadelphia*, 52 PPER 67 (Final Order 2019) (hereinafter, *FOP Lodge, No. 5 2019*)).

In a final order dated September 19, 2023, the PLRB dismissed the Union's exceptions to the PDO on the same grounds as the Hearing Examiner. Consequently, the Union filed the instant, timely appeal.[4]

---

[4] As noted by the PLRB, the Union has made no demand for impact bargaining "on any separate issue of wages, hours, and working conditions that is capable of severance from the [r]eferendum. . . ." PLRB's Final Order at 5. Therefore, the PLRB did not analyze whether the Jail failed to conduct impact bargaining with the Union. *PSSU, Local 688 of SEIU, AFL-CIO v. Pennsylvania Labor Relations Board*, 763 A.2d 560, 563-64 (Pa. Cmwlth. 2000).

## II. Issues

Before this Court,[5] the Union asserts that the PLRB erred in determining that the Jail's solitary confinement and disciplinary use of force policies are within the scope of the Jail's managerial prerogatives. We agree with the decisions below.

## III. Discussion

Preliminarily:

> [A]s a general matter, public entities subjected to PERA make a variety of decisions in fulfilling their mission. Certain of these decisions relate to the formulation and implementation of policies. Other decisions go to the relationship between the public entities and the individuals that they employ. With respect to those decisions, [] certain topics under PERA are considered to be mandatory subjects of bargaining, others are considered to be permissive or voluntary subjects of bargaining, and, finally, certain matters are not to be permitted at all, as they are deemed to be illegal subjects of bargaining.

*Association of Pennsylvania State College and University Faculties v. Pennsylvania Labor Relations Board*, 226 A.3d 1229, 1241 (Pa. 2020). Section 701 of PERA mandates that "public employers must collectively bargain with employee representatives over wages, hours, and other terms and conditions of employment." *Id.*; *see also Crawford County v. Pennsylvania Labor Relations Board*, 659 A.2d

---

[5] Our review is limited to determining whether findings of fact are supported by substantial evidence, and whether the PLRB violated constitutional rights, committed a procedural irregularity, or erred as a matter of law. *Chester Upland School District v. Pennsylvania Labor Relations Board*, 150 A.3d 143, 149 n.2 (Pa. Cmwlth. 2016). "[I]t is well settled that a decision of the PLRB must be upheld if the PLRB's factual findings are supported by substantial evidence, and if conclusions of law drawn from those facts are reasonable, not capricious, arbitrary, or illegal." *Borough of Ellwood City v. Pennsylvania Labor Relations Board*, 998 A.2d 589, 594 (Pa. 2010) (citation omitted)

6

1078, 1081 (Pa. Cmwlth. 1995) ("The concept of 'other terms and conditions of employment' . . . refers to such things as, but not limited to, various physical conditions of one's working surroundings, what quantity and quality of work is required during one's work period, what safety practices prevail at and near the job site . . . .").

However, this mandate is not unlimited: "As Section 702 [of PERA[6]] unambiguously provides that a public employer is not required to bargain if the topic is one of inherent managerial policy." *Id*. Moreover, Section 703 of PERA, 43 P.S. §1101.703, provides that a legislative mandate may not be bargained over or contravened by a collective bargaining agreement:

> The parties to the collective bargaining process shall not affect or implement a provision in a collective bargaining agreement if the implementation of that provision would be in violation of, or inconsistent with, or in conflict with any statute or statutes enacted by the General Assembly of the Commonwealth of Pennsylvania or the provisions of municipal home rule charters.

---

[6] Section 702 of PERA provides:

> Public employers shall not be required to bargain over matters of inherent managerial policy, which shall include but shall not be limited to such areas of discretion or policy as the functions and programs of the public employer, standards of services, its overall budget, utilization of technology, the organizational structure and selection and direction of personnel. Public employers, however, shall be required to meet and discuss on policy matters affecting wages, hours and terms and conditions of employment as well as the impact thereon upon request by public employe representatives.

43 P.S. §1101.702.

7

Nevertheless, a municipality may not "sidestep" its bargaining obligations "under the guise" of a local ordinance. *See Borough of Geistown v. Pennsylvania Labor Relations Board*, 679 A.2d 1330, 1331 (Pa. Cmwlth. 1996).

While the Ordinance is not itself a provision of the County's Home Rule Charter, but an ordinance included in the County's Jail Code and therefore is not subject to Section 703, we remain sensitive to the central tension in this case: the expression of the County voters' will through the Ordinance and the Union's collective bargaining rights under PERA. To that end, despite the Union's obvious disapproval of the Ordinance, we also express no opinion on the desirability or validity thereof. We are merely considering whether the Jail's implementation of the Ordinance, by way of its updated policies, has implicated a bargainable term or condition of the COs' employment. Thus, under PERA, we must "determine whether the impact of the issue on the interest of the employe in wages, hours and terms of conditions of employment outweighs its probable effect on the basic policy of the [public employer] as a whole." *State College*, 337 A.2d at 268. Stated differently,

> the courts[] must consider the relative weight of the impacted interest of the public employee in wages, hours, and conditions of employment against the public employer's impacted interest in basic policy matters concerning the employer's operations, and then assess which interest predominates. If the impact on the employees' interest in wages, hours, and conditions of employment outweighs the employer's concerns about restrictions on its basic policy choices, the proposal is considered a mandatory subject of bargaining. If, however, the latter outweighs the former, such topic shall be deemed to constitute an inherent managerial prerogative and be insulated from the give-and-take of mandatory collective bargaining. Nevertheless, under Section 702, the public employer shall, at least, meet about

8

and discuss such topics upon request by the public employee's representative.

*Association of Pennsylvania State College and University Faculties*, 226 A.3d at 1243-44 (citing *State College*, 337 A.2d at 267-68). Further, as we explained in *Teamsters Local 77 & 250 v. Pennsylvania Labor Relations Board*, 786 A.2d 299, 305 (Pa. Cmwlth. 2001), "if a matter is a managerial prerogative under Act 111['s stricter standard[7]], then it *a fortiori* is a managerial prerogative under PERA." Thus, where analogous, Act 111 case law is instructive.

### A. The Solitary Confinement Policy

Throughout the Union's brief, the Union expresses its considerable objection to the characterization of the Jail's RHU as "solitary confinement," *see* Union's Brief at 20-46, as well as its dissatisfaction with the results of the referendum and the Ordinance. *See id*. at 18, 20-22. For example, the Union argues that "the premise of the Ordinance itself, that 'solitary confinement' existed at the Jail that harmed the inmates and that had to be eliminated, was false. Relying upon it is unreasonable given this lack of substantial evidence justifying its restriction." *Id*. at 31.

The Union also directs our attention to the testimonies of Union President Brian Englert and Sergeant Hunter Sarver to argue that the Hearing Examiner's findings of fact regarding the decrease in workplace safety was not supported by substantial evidence. In primary part, Englert's testimony related to his belief that the Informal Resolution Policy was historically effective and that, in his view, the Jail's new policies were less effective. *See, e.g.*, Examiner's Hearing,

---

[7] The Policemen and Firemen Collective Bargaining Act, Act of June 24, 1968, P.L. 237, *as amended*, 43 P.S. §§217.1-217.10 (commonly known as Act 111).

Notes of Testimony (N.T.), 4/26/22, at 46-47 (stating his opinion that the new policy was much less effective than the Informal Resolution Policy). To the extent that Englert's testimony related to workplace safety, he engaged in the following exchange:

> Q. All right. Now, with regard to RHU and then with regard to [the Informal Resolution Policy], how did the use of those methods help with officer safety?
>
> A. I mean, in many different ways. So, if you had an inmate that was maybe trying to incite the unit towards mass misbehavior, that would correct behavior. If you had an inmate that was having multiple people in their cell which is against the rules, that's very dangerous because then, it may appear that it's okay to do and then, somebody could get run in on or robbed and beat up.

*Id*. at 43-44. Englert also believed that the Informal Resolution Policy helped COs more effectively discipline dangerous contraband. *Id*. Finally, as proof that the new policy is ineffective, the Union offered Englert's testimony regarding the use of facility-wide lockdowns (an exception to the Ordinance's prohibition on solitary confinement) since the enactment of the Ordinance. Union's Brief at 35 (citing Examiner's Hearing, N.T., at 48-49). However, Englert did acknowledge that these lockdowns were used to rectify staffing issues. *Id*.

Likewise, the Union relied on Sarver's testimony which primarily related to the efficacy of the Informal Resolution Policy and the insufficient staffing under the new policy. Union's Brief at 39-46. Regarding workplace safety:

> Q. In your experience, what effect, if any, does the ability to use [Informal Resolution Policy] provide for the safety of COs which would include you, not only the [COs] in RHU, but also you as a sergeant, for example?

> A.  In my time, I've been trained that the most dangerous type of inmate is a potentially uncooperative inmate. . . . . [Inmates] have assaulted officers over the smallest, littlest arguments . . . .

Examiner's Hearing, N.T., at 121-22.  After lamenting the loss of the progressive discipline permitted under the Informal Resolution Policy, Sarver explained that COs must now "nag" the inmates to comply with the rules and that "these inmates are tired of being told what to do over and over again.  And it does often result in staff assaults and other issues, refusals to lock in on the general housing population units." *Id*. at 123.  To the extent that the policy implicates staffing, Sarver testified that the COs monitoring the RHU are often unable to complete the recreation schedules for a given day due to the increase in the duration of the recreation period. *Id*. at 123-24.  Sarver believed this change implicated CO safety because the COs now have to spend "more time" escorting inmates in the RHU than they previously did. *Id*.

Further, the Union contends that although the Jail's new policy directly addresses inmate recreation time, it nevertheless affects CO safety because "the Jail does not have the officer staffing available to monitor" inmates for four hours of recreation.  Union's Brief at 47.  Similarly, the weakening of the Informal Resolution Policy has resulted in increased noncompliance by inmates in the general population, who, in turn, are placed in the RHU. *Id*.  Because of the alleged inadequate staffing and the increase in the RHU population, the Union fears it cannot maintain officer safety while effectuating the new policy thereby subjecting the policy to mandatory bargaining as a "term of employment." *Id*. (citing *Appeal of City of Erie*, 459 A.2d 1320 (Pa. Cmwlth. 1983); *City of Allentown v. International Association of Fire Fighters Local 302*, 157 A.3d 899 (Pa. 2017)).  For similar reasons, the Union asserts that its interest in CO safety outweighs the probable effect on the Jail's policy, *i.e.*,

11

its choice in directing the care, custody, and control of its inmates. Union's Brief at 49.

The PLRB responds that the solitary confinement policy is an inherently managerial prerogative - and exempted from collective bargaining under Section 702 - because there is a distinction between decisions which establish the number of employees that work for a public employer and those which establish the number of employees that will be assigned to a particular task. The former is within the scope of the public employer's managerial prerogative, whereas the latter is the subject of mandatory bargaining. PLRB's Brief at 9 (citing *International Association of Fire Fighters, Local 669 v. City of Scranton*, 429 A.2d 779 (Pa. Cmwlth. 1981)). Therefore, the PLRB views the Union's reliance on *City of Allentown* as misplaced because the decision therein turned on the minimum number of employees assigned to a particular shift. The PLRB observes that the Union's testimony pertained solely to the number of employees in its entire complement, rather than the number of employees required to monitor inmates for four hours of recreation. PLRB's Brief at 10. Thus, the PLRB asserts, we must employ the test enunciated in *State College* and conclude that the speculative increase in harm to CO safety does not outweigh the Jail's interest in directing the care, custody, and control of its inmates. PLRB's Brief at 7.

Presently, the only tangible argument advanced by the Union is its concern that the Jail is not adequately staffed to accommodate four hours of recreation. However, despite the Union's comparison thereto, the present matter is unlike *City of Allentown* or related Act 111 case law. Therein, our Supreme Court sought to determine whether an arbitrator had the authority under Act 111 to mandate

12

minimum staffing levels per shift for the City of Allentown's (Allentown) fire fighters. *City of Allentown*, 157 A.3d at 902-03. The Court explained that

> the divisions between [managerial prerogatives and the subjects of mandatory bargaining] are not always clear. One may envision a Venn diagram with topics in the overlapping space that are terms and conditions of employment – which are subject to collective bargaining, and may serve as the part of an interest arbitration award – that also implicate matter of managerial responsibility – over which negotiation is not mandated, and which cannot serve as the basis for an arbitration award. As explained below, mandatory minimum shift staffing is one of these topics.

*Id*. at 907. To resolve this matter, the High Court focused on the final inquiry under the *Borough of Ellwood City* standard, *i.e.*, "whether collective bargaining would unduly infringe upon the public employer's managerial responsibilities." *Id*. at 908 (quoting *Borough of Ellwood City*, 988 A.2d at 600). Based upon the comprehensive testimony and documentary evidence adduced by the union throughout the arbitration proceedings, the High Court reasoned that "there is a **direct and significant** relationship between the number of individuals available to respond to a call at a station – minimum shift staffing – and [Allentown's] fire fighters." *Id.* at 913 (emphasis added).

More specifically, the union proffered the testimony of the President of the Pennsylvania Professional Fire Fighters Association who testified to the direct relationship between the ability to respond to a fire and staffing adequacy regarding fire propagation (the relationship between time and a fire's temperature). *City of Allentown*, 157 A.3d at 912. The union also introduced the testimony of Allentown's fire captain, who, in pertinent part, offered that over a period of years, adequate staffing had reduced injuries by nearly 50%. A recent reduction in staffing, however,

13

was attended by a corresponding increase in injuries. *Id*. at 913. In contrast, Allentown offered the testimony of its financial manager who explained that minimum shift staffing led to more overtime pay which stressed Allentown's pension expenses. *Id*. The Supreme Court viewed Allentown's evidence as "tangential," such that Allentown failed to demonstrate how the mandatory minimum shift staffing unduly infringed upon the City's managerial responsibilities. *Id*. at 913-14.

Similarly, the present matter is also distinct from *City of Scranton* and *Appeal of City of Erie*. In *City of Scranton*, 429 A.2d at 780, this Court assessed whether "the alleged understaffing of [a] fire department b[ore] a rational relationship to the performance of the fire fighters' duties" and thus whether "the staffing complement [was] bargainable under Act 111." *Id*. At bottom, we viewed the dispute as "whether the [Court would] permit the members of the fire and police forces to decided how much of the municipal budget [would] be spent in the areas of fire and police protection, under the guise of safety considerations." *Id*. at 781. In concluding that the matter was not a subject of mandatory collective bargaining, we ultimately drew a distinction between the "total number of persons on the force (not arbitrable), and the number of persons on duty at a station, or assigned to a piece of equipment, or to be deployed to a fire (all arbitrable [as rationally relating to safe working conditions])." *Id*. at 781. Relying on this distinction, in *Appeal of City of Erie*, 459 A.2d at 1321, this Court found that minimum staffing per fire fighting rig was arbitrable under Act 111 because the union's expert witness testified to the risk posed by understaffing fire fighter rigs. *Id*.

Here, the Act 111 case law relied upon by the Union and the PLRB does not squarely address the issue before us – whether greater inmate recreation

14

time impacts CO safety – because this line of cases focuses on minimum staffing. While the Union has exhaustively detailed the testimony it believes favors its position, *see* Union's Brief at 20-46, 49-54, none of the testimony relates to minimum CO staffing or a change in the number of COs escorting RHU inmates and any direct attendant increase in risk to CO safety. The testimony simply states that, sometimes, the COs in the RHU are unable to complete their recreation schedules and that they now must inexplicably spend more time escorting inmates.[8] As such, to the extent that these cases remain persuasive, we are reminded that, like in *City of Scranton*, 429 A.2d at 781, the Union cannot subject the Jail's policy making decisions to mandatory collective bargaining under the guise of workplace safety without demonstrating a direct and significant relationship between the policy and CO safety.[9] *Appeal of City of Erie*, 459 A.2d at 1321; *City of Allentown*, 157 A.3d at 913.

Like Allentown above, we believe the Union's evidence is too tangential to sustain a finding that the Jail's new policy implicates CO safety. Based on the proffered evidence and on the facts as found by the Hearing Examiner, *see* PDO at 8, the Union has failed to demonstrate that the Jail's policy resulted in *any* observable impact on the COs' terms of employment as relating to workplace safety. Really, the Union's reliance on its leadership's testimony only established that which we already knew: the Union views the Informal Resolution Policy as more desirable than the current policy. But, as the Hearing Examiner observed, the testimony failed

---

[8] It remains unclear how a change in the *duration* of an inmate's recreation time would cause an increase in the number of inmate escorts or the length of that escort.

[9] Indeed, the Hearing Examiner correctly observed that if we were to accept this rationale, it would be difficult to conceive of a jail policy which would not touch upon CO safety and thereby require mandatory bargaining given how closely the COs work with the inmates.

15

to establish a "legally substantial health and safety impact on the COs." *Id*. In particular, the Hearing Examiner and the PLRB correctly acknowledged that Englert and Sarver's testimony broadly alleged an increase in inmate violence against COs due to the new policy but failed to recall specific instances or offer any formal record of the same.[10] Thus, stated in the context of the *State College* test, the Union's overly generalized interest in CO safety, if implicated at all, cannot outweigh what would be the restriction on the Jail's interest in improving inmate care. Section 702 of PERA therefore exempts the Jail's new policy aimed at inmate care and recreation from mandatory collective bargaining.

### B. Use of Force Policy

The Union argues that the Jail's unilateral changes to the use of force policy likewise impacts officer safety, thus requiring collective bargaining. Petitioner's Brief at 55-60. More particularly, the Union argues that while the Jail has eliminated use of force policies which serve legitimate purposes, like pepper spray, restraint chairs, and leg shackles, it has failed to replace any of these policies with a viable alternative, causing the COs to "take a hands-on control approach to inmate custody, including cell extractions." *Id*. at 57-58. The Union similarly believes that it clearly demonstrated that the implementation of pepper spray as a use of force method results in fewer CO injuries and altercations by way of 11 incident reports that were recorded after the implementation of the new use of force policy. *Id*.; *see also* Reproduced Record (R.R.) at 425a-45a. Finally, the Union

---

[10] In any case, to the extent the Union shares or otherwise adopts Englert and Sarver's rationale, we are unpersuaded. For example, it is unclear why "nagging" has induced a substantial increase in inmate violence against COs, *see* Examiner's Hearing, N.T., at 121-22, but the actual *discipline* of the inmates by way of the Informal Resolution Policy would lead to more peaceful outcomes.

16

directs our attention to the Department of Corrections' (DOC) regulations, 37 Pa. Code §§91-97.119. In particular, the Union relies on the provisions which were "designed to encourage county prisons to develop and utilize local policies and procedures that are in keeping with existing State law and recognized professional standards . . . ." *Id.* at 60 (citing 37 Pa. Code §95.220). The Union asserts that because DOC's regulations "permit[] counties the discretion to utilize restraints and chemical munitions[,] . . . [DOC's regulations] establish[ed] a direct relationship between corrections enforcement equipment and techniques and the safety/security of the [COs] working in jails." *Id.* at 61. As a consequence, the Union believes that the use of force policy is subject to mandatory collective bargaining. *Id.*

The PLRB responds that the Jail is merely directing its personnel's use of force as a managerial prerogative and that, as above, the Union has failed to establish any appreciable decrease in CO safety. PLRB's Brief at 11-12.

"As we have emphasized in the past, the [PLRB] possesses administrative expertise in the area of public labor relations, and therefore its decisions are entitled to a measure of deference from this Court." *Teamsters Local 77 & 250*, 786 A.2d at 304 (citing *American Federation of State, County and Municipal Employees, Council 13, AFL-CIO v. Pennsylvania Labor Relations Board*, 616 A.2d 135, 138 (Pa. Cmwlth. 1992)). Here, the Hearing Examiner relied on a number of the PLRB's own decisions in determining that the Jail's right to direct its personnel included its ability to unilaterally alter its use of force policy. *See Fraternal Order of Police, Lodge No. 5 v. City of Philadelphia*, 45 PPER 105 (PDO, 2014) (directive requiring discipline for officers who did not attempt to stop another officer using greater force than authorized by Philadelphia's "use of force continuum" constituted a managerial prerogative); *Middletown Borough Police*

*Officer Association v. Middletown Borough*, 46 PPER 78 (PDO, 2015), *aff'd in part, rev'd in part on other grounds*, 47 PPER 30 (Final Order, 2015) (borough exercised its managerial prerogative in altering its law enforcement's use of force policy by increasing "the decision" to refrain from or use force from 6 to 8 "steps"); *FOP Lodge, No. 5 2019*, 52 PPER 67 (agreeing with hearing examiner below that even if the union's charges were not filed prematurely that "employer rules pertaining to the use of force and weapons are valid exercise of managerial prerogative and not subject to bargaining").

Here, upon review of the PLRB's Act 111 case law, we find the following principle to be persuasive and applicable: a public employer's use of force policy is a valid expression of its managerial prerogative and not subject to bargaining. Therefore, because use of force policies are not subject to bargaining under Act 111's stricter standard, Section 702 of PERA must also necessarily exempt use of force policies from mandatory collective bargaining. *See Teamsters Local 77 & 250*, 786 A.2d at 305 ("[I]f a matter is a managerial prerogative under Act 111['s stricter standard], then it *a fortiori* is a managerial prerogative under PERA."). Even if we applied the *State College* test, absent further tangible,[11] compelling evidence that CO safety is seriously impacted by the Jail's change to the quantum of force or the mechanisms permitted in its use of force policy, the Union's interest could not outweigh that of the Jail's policy choice. To hold otherwise would be to set the Union and the Jail on equal footing as policy makers in contravention of Section 702.

---

[11] Although the Union submitted 11 incident reports on this point, the reports are just that, incident reports. The reports do nothing to demonstrate an *increase* in risk to CO safety since the implementation of the new policy. Conversely, each incident report also suggests that the new use of force policy still enables the COs to effectively deal with dangerous incidents within the Jail. *See* R.R. at 425a-45a.

Finally, the Union's reliance on the DOC's regulations betrays its own argument. Section 95.241 of the DOC's regulations, 37 Pa. Code §95.241, establishes the "minimum requirements" concerning a county jail's security procedures. Among other things, the DOC's regulations require the development of a written use of force policy that "restrict[s]" use of force to "instances of justifiable self-defense, protection of others, protection of property, prevention of escapes, and to effect compliance with the rules and regulations of the facility when other methods are ineffective or insufficient and only the least amount of force necessary to achieve that purpose is authorized." *Id*. §95.241(2)(i). It further mandates that local policy must identify "[a]uthorized equipment such as physical restraints, chemical agents, stun devices, batons or firearms permitted for use by prison staff." *Id*. §95.241(2)(ii)(B).

Although these provisions of the DOC's regulations demonstrate that an obvious relationship exists between a CO's ability to use force – *e.g.*, in instances of justifiable self-defense – and the CO's safety, it does nothing to establish that a county jail's use of force policy is a bargainable term or condition of employment.[12]

---

[12] Although the Concurring and Dissenting Opinion (CO/DO), *Allegheny County Prison Employees Independent Union v. Pennsylvania Labor Relations Board*, __ A.3d__ , (Pa. Cmwlth., No. 1139 C.D. 2023, filed May 30, 2025) (Wallace, J., concurring and dissenting), does not discuss the Union's arguments on this point, it seems the CO/DO would begin and end its analysis of this issue here, with the recognition that a relationship exists between a CO's ability to use force and his or her safety. While the CO/DO appears to recognize that the Jail has an interest in inmate care, slip op. at 6, and then purports "to weigh the interests at play," it offers no material reason for concluding that the COs' interest in safety does not unduly infringe upon the Jail's basic policy choices beyond referring to the interest in safety as "vital." *Id*., slip op. at 6-7.

Of course, employee safety is an ever-present interest, and the COs do indeed face "unique" working conditions, sometimes working with "noncompliant, aggressive, or violent" inmates. CO/DO at 7. This Opinion should not be interpreted in any way to cast doubt on that notion. This mere fact alone, however, cannot subject any Jail policy which touches on employee safety (of

**(Footnote continued on next page…)**

which there are many) to mandatory collective bargaining. Indeed, as this Court made clear in *City of Scranton*, 429 A.2d at 781-82, safety considerations are not to be treated as a cloak under which a union may assume the public employer's policy making functions.

Here, the Jail's interest in caring and controlling the inmates in its custody goes beyond that of a mere policy statement. Rather, the Jail is ultimately responsible for its inmates. *See, e.g.*, *Neely v. Department of Corrections*, 838 A.2d 16, 20 (Pa. Cmwlth. 2003) ("Accordingly, the Eighth Amendment [of the United States Constitution, U.S. Const. amend. VIII,] places restraints on prison officials, who may not, for example, use excessive physical force. It also imposes duties on these officials who must provide humane conditions of confinement, ensuring that inmates receive adequate food, clothing, shelter and medical care."). To this end, the DOC's regulations vest the Jail alone with the responsibility to establish a written use of force policy and to authorize certain equipment for that purpose therein. 37 Pa. Code §§95.241(2)(i), (ii)(B). In this respect, the Jail's written use of force policy is meant to benefit both the COs and the inmates, by guaranteeing the former's safety while ensuring that the use of force is not excessively used against the latter. If we were to mandate collective bargaining in this instance, the Union would unduly infringe upon the Jail's ability to affect a desirable policy for this purpose. Therefore, as Section 702 of PERA intends, the discretion to promulgate this policy lies with the public employer, responsible for both the employee and the inmate, not the public employee.

At bottom, the CO/DO endorses a rationale in which any change to a use of force policy, if only perceived to afford a CO with "less" safety than before, would necessitate collective bargaining. Taken to its logical extreme, this reasoning would mean that once the Jail enshrines a use of force mechanism in its policy, it cannot be modified or lessened without the consent of the Union – even, as here, where the newly promulgated use of force policy still enables the COs to obtain inmate compliance or effectively deal with dangerous incidents within the jail. *Again, see* R.R. at 425a-45a. One must wonder, if, under the CO/DO's theory, where a county jail had originally authorized use of force mechanisms which constituted the bare minimum permitted under the DOC's regulations in terms of CO safety, whether the respective union would be permitted to bargain to obtain "more" safety for its COs.

Herein lies the CO/DO's error: notwithstanding our Supreme Court's admonition to the contrary, the CO/DO wishes to set the Union and the Jail on equal footing as policy makers. *Association of Pennsylvania State College and University Faculties*, 226 A.3d at 1242; *Abington Heights School District v. Pennsylvania Labor Relations Board* (Pa. Cmwlth., No. 404 C.D. 2021, filed February 10, 2022), slip op. at 12. Indeed, the CO/DO would permit the Union to direct the Jail's policy as it concerns the modicum and mechanism of force to be perpetuated *against* the inmates, for whom *the Jail* is responsible for caring.

When making such a determination as this, "the paramount concern must be the public interest in providing for the effective performance of the public service in question." *State College*,
**(Footnote continued on next page…)**

20

If anything, the DOC's regulations stand for the proposition that county jails have discretion to further restrict their officers' use of force so long as the policy comports with the minimum requirements set forth therein. In any case, here, the Jail has complied with the DOC's regulations by updating its written policy to deauthorize the use of physical restraints, pepper spray, and leg shackles, while leaving the use of other control techniques in place. *Cf.* R.R. at 446a-58a (former policy), and R.R. at 459a-69a (current policy).

Section 702 of PERA makes it clear that a public employer's managerial prerogatives are exempt from mandatory bargaining, in part, because the collective bargaining process does not permit "public employees to set matters of public policy or participate with their public employer in administering the public enterprise." *Association of Pennsylvania State College and University Faculties*, 226 A.3d at 1242. Here, were we to permit the Union to subject the Jail's solitary confinement and use of force policies to mandatory bargaining, we would be permitting exactly that. Thus, neither the Hearing Examiner nor the PLRB erred in concluding that the Jail did not violate Section 1201(a)(1) or (5) of PERA.

## IV. Conclusion

Accordingly, the final order of the PLRB is AFFIRMED.

_____
MICHAEL H. WOJCIK, Judge

---

337 A.2d at 267-68. Based on the foregoing, we are satisfied that the public interest in the public service in question – establishing the use of force policy to be used by COs against the Jail's inmates – properly lies with the Jail alone.

21

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Allegheny County Prison Employees
Independent Union,

          Petitioner

      v.

Pennsylvania Labor Relations Board,

          Respondent

   : 
   : 
   : 
   : 
   : 
   : No. 1139 C.D. 2023
   : 
   : 
   : 
   : 

# **O R D E R**

     AND NOW, this 30th day of May, 2025, the Order of the Pennsylvania Labor Relations Board dated September 19, 2023, is **AFFIRMED**.

 

_____
MICHAEL H. WOJCIK, Judge

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Allegheny County Prison Employees   :
Independent Union,   :
              Petitioner   :
  :
        v.   : No. 1139 C.D. 2023
  : Argued: October 8, 2024
Pennsylvania Labor Relations Board,   :
             Respondent   :


BEFORE:    HONORABLE ANNE E. COVEY, Judge
                  HONORABLE MICHAEL H. WOJCIK, Judge
                  HONORABLE STACY WALLACE, Judge


CONCURRING AND DISSENTING OPINION
BY JUDGE WALLACE                          FILED: May 30, 2025


I concur, albeit with some hesitancy, with the Majority's conclusion that the Allegheny County Jail's (Jail) modified policy regarding solitary confinement is exempt from mandatory collective bargaining under Section 702 of the Pennsylvania Employe Relations Act (PERA).[1,2] Respectfully, however, I dissent to that portion

---

[1] 43 P.S. § 1101.702. Act of July 23, 1970, P.L. 563, *as amended*, 43 P.S. §§ 1101.101-1101.2301.

[2] To clarify, I concur in the Majority's result because I agree the Jail's solitary confinement policy predominately implicates the Jail's management interest in the care, custody, and control of its inmates. However, I question why anything that is truly merely managerial in nature would find its way to be voted on by the electorate in the form of a referendum. That being said, I separate myself from much of the Majority's analysis on this issue. For example, I would not join in footnote 10. *Allegheny Cnty. Prison Emps. Indep. Union v. Pa. Lab. Rels. Bd.* (Pa. Cmwlth., No. 1139 C.D. 2023, filed May 30, 2025), slip op. at 16 n.10 (Majority Opinion). While I agree it is not completely clear why "nagging" has induced an increase in inmate violence, it is easily conceivable that more frequent "nagging" requests would naturally lead to an increase in
**(Footnote continued on next page…)**

of the Majority's opinion pertaining to the Jail's modified disciplinary use of force policy (Policy), which prohibits the use of leg chains, oleoresin capsicum spray (OC spray), and restraint chairs by the COs, and concluding Section 702 of PERA exempts the Policy from mandatory collective bargaining.[3]

As the Majority observes, Section 701 of PERA requires public employers to collectively bargain with employee representatives over wages, hours, and other terms and conditions of employment. 43 P.S. § 1101.701. However, this right to

_____

confrontations between the inmates and the COs, and consequentially less compliance, more aggression, and thus more incidents of violence. One can think easily of a relationship between a parent and child or two spouses where one is perceived as "nagging," which leads to an increase in confrontation. Furthermore, I do not agree with the Majority's characterization of the Union's interest in CO safety as "overly generalized." Majority Op. at 16. While I agree with the Union that CO safety is implicated by the solitary confinement policy, I believe it is less impacted by this policy than it is by the Jail's updated use of force policy, and I cannot agree that the Union's interest outweighs the Jail's management interest when it comes to the solitary confinement policy.

[3] The Majority relies on a review of the Pennsylvania Labor Relations Board's (Board), as opposed to precedential, decisions. The Board has found use of force policies to be a managerial prerogative under Act 111. The Majority Opinion provides:

> Here, upon review of the PLRB's Act 111 caselaw, we find the following principle persuasive and applicable: a public employer's use of force policy is a valid expression of its managerial prerogative and not subject to bargaining. Therefore, because use of force policies are not subject to bargaining under Act 111's stricter standard, Section 702 of PERA must also necessarily exempt use of force policies from mandatory collective bargaining. *See Teamsters Local 77 & 250* [*v. Pa. Lab. Rels. Bd.*], 786 A.2d [299,] 305 [(Pa. Cmwlth. 2001)] ("[I]f a matter is a managerial prerogative under Act 111['s stricter standard], then it *a fortiori* is a managerial prerogative under PERA.").

Majority Op. at 18. To be clear, the *Teamsters* case does not address use of force. Rather, *Teamsters* is about the elimination of a light-duty position to injured employees receiving workers' compensation benefits. *See generally Teamsters*. The Majority seems to be citing the *Teamsters* case to extend the Board's Act 111 reasoning to this PERA case. However, the Board's decisions, "while entitled to a measure of deference," *see Teamsters*, 786 A.2d at 304, are not binding on this Court.

collective bargaining is limited by Section 702 of PERA, which permits public employers to refuse to bargain over matters of "inherent managerial policy," or management prerogatives. 43 P.S. § 1101.702. Our legislature has defined these management prerogatives to include areas of discretion or policy regarding functions, programs, standards of service, budget, utilization of technology, and selection and direction of personnel. *Id.* Therefore, when reading Section 701 in conjunction with Section 702, we are tasked with "distinguish[ing] between the area of managerial prerogative and the areas of vital concern to employes." *Pa. Lab. Rels. Bd. v. State Coll. Area Sch. Dist.*, 337 A.2d 262, 266 (Pa. 1975).

In conducting this analysis, we rely on the framework set forth by the Pennsylvania Supreme Court in *State College.* In *State College*, the Court recognized the potential for overlap between managerial prerogatives and areas of concern to employees regarding their terms or conditions of employment. *Id.* To address these situations, the Court offered the following test for the courts to apply on a case-by-case basis:

> [W]here an item of dispute is a matter of fundamental concern to the employes' interest in wages, hours and other terms and conditions of employment, it is not removed as a matter subject to good faith bargaining under section 701 simply because it may touch upon basic policy. It is the duty of the Board in the first instance and the courts thereafter to determine whether the impact of the issue on the interest of the employe in wages, hours and terms and conditions of employment outweighs its probable effect on the basic policy of the system as a whole.

*Id.* "Thus, in determining whether a topic is subject to collective bargaining, . . . the courts[] must consider the relative weight of the impacted interest of the public employee in wages, hours, and conditions of employment against the public employer's impacted interest in basic policy matters concerning the employer's

operations, and then assess which interest predominates." *Ass'n of Pa. State Coll. & Univ. Facs. v. Pa. Lab. Rels. Bd.*, 226 A.3d 1229, 1244 (Pa. 2020).

In sum, the *State College* test requires that we first determine whether the topic is related to the employees' terms and conditions of employment. If so, we next consider whether the topic also implicates the employer's managerial responsibility.[4]

If the topic is related to a term and condition of employment and also implicates managerial responsibilities, our final inquiry is "whether collective bargaining over the topic would unduly infringe upon the public employer's managerial responsibilities." *Borough of Ellwood City v. Pa. Lab. Rels. Bd.*, 998 A.2d 589, 600 (Pa. 2010).

In applying the approach set forth in *State College*, I would conclude the Jail's Policy undeniably impacts the COs' "terms and conditions of employment." "[T]he General Assembly intended that the scope of collective bargaining set forth in Section [701] be viewed broadly, to encompass any subject that is rationally related to the 'terms and conditions of employment,' including employee 'compensation, hours, working conditions, pensions, retirement and other benefits.'" *City of Phila. v. Int'l Ass'n of Firefighters, Loc. 22*, 999 A.2d 555, 569 (Pa. 2010); s*ee also Borough of Ellwood City*, 998 A.2d at 598 ("We can safely say . . . that the concept [of what constitutes a working condition] is a broad one."). Although what constitutes "working conditions" is not easily defined, it must "capture the differing

---

[4] As with the solitary conferment policy, mentioned *supra*, I question whether the fact that the use of force policy was put to a vote by the public at large is an indication this is more than a mere managerial prerogative. It seems to me to be an irreconcilable conflict to list an issue for vote by the public at large and at the same time conclude the issue is a managerial prerogative.

environments that exist at various workplaces." *Id*. "[W]orking conditions are those subjects 'germane' to the working environment." *Id*. (citation omitted).

Here, the COs' work environment at the Jail is a correctional facility that houses inmates, including inmates that can be noncompliant, combative, and resistant, over whom the COs must gain compliance and control. Reproduced Record (R.R.) at 56a. Historically, the COs at the Jail had access to restraint chairs, leg restraints, and OC spray, tools which assisted them in gaining necessary compliance and control. *Id*. at 50a. Following the Referendum, the Jail changed its Policy and prohibited the use of these tools. *Id*. The Allegheny County Prison Employees Independent Union (Union), as a representative of the COs, presented testimony that without these tools, it takes more COs to physically gain compliance of inmates, COs are required to take a more "hands-on" approach to gaining compliance, and COs are required to employ more serious uses of force to obtain compliance. *Id*. at 54a-59a, 73a-79a. Additionally, the Union presented testimony that the use of leg restraints and restraint chairs reduced inmates' ability to kick COs and run from COs. *Id*.

Unlike the Majority, I have no difficulty concluding the Jail's Policy implicates the COs' safety concerns, a subject certainly "germane" to their working conditions. It is beyond dispute that workplace safety is a fundamental concern for the COs. It is also apparent that the Jail's Policy, which eliminates the use of tools that assisted the COs in gaining compliance from inmates, consequentially impacts the safety and security of the work environment for the COs. Accordingly, I would conclude the Jail's Policy is a matter of fundamental concern to the COs' interests in their "terms and conditions of employment." *State College*, 337 A.2d at 266.

Turning to the second prong under the *State College* approach, I agree with the Majority that the Jail has a managerial interest in "improving inmate care." Majority's Op. at 16. The "mission of the Bureau of Corrections is to increase public safety in Allegheny County by providing **care, custody and control of persons incarcerated**, and to reduce recidivism through programs that help persons reenter and succeed in society." Allegheny County Jail 2024 Annual Warden's Report, https://www.alleghenycounty.us/files/assets/county/v/1/government/jail/reports/2024/2024-acj-annual-wardens-report.pdf (last visited May 29, 2025) (emphasis added). Therefore, it is clear the Jail has a managerial interest in implementing policies that pertain to the care, custody, and control of inmates, including the Policy.

Because we are faced with a situation in which the topic at issue impacts both the COs' interest in their working conditions and the Jail's interest in its managerial policy, in applying *State College's* framework, I would weigh the respective interests against each other. In my view, the safety of the COs is a vital concern. As a general rule, the safety of employees in their workplaces is a strong public policy concern in the Commonwealth. *See* Section 2(a) of the General Safety Law,[5] 43 P.S. § 25-2(a) (pursuant to Pennsylvania law, "[a]ll establishments shall be so constructed, equipped, arranged, operated, and conducted as to provide reasonable and adequate protection for the life, limb, health, safety, and morals of all persons employed therein"); *Commonwealth v. Butler Cnty. Mushroom Farm*, 454 A.2d 1, 5 (Pa. 1982) (the enactment of the General Safety Law "unequivocally demonstrates a legislative concern for the safety of employees in their employment environment"). It is undeniable that COs working within a correctional facility face unique working conditions where they are tasked with gaining compliance and control of inmates.

---

[5] Act of May 18, 1937, P.L. 654, *as amended*, 43 P.S. §§ 25-1-25-15.

Because their working conditions include regularly addressing issues with inmates who may be noncompliant, aggressive, or violent, I cannot agree with the Majority that "the Union's interest could not outweigh that of the Jail's policy choice" here. Majority Op. at 18. The Union has a clear interest in safe working conditions, and, when I weigh the interests at play, the safety of the COs' work environment outweighs the Jail's management interest in implementing the Policy.[6] Therefore, I do not believe collective bargaining over this topic would unduly infringe upon the Jail's managerial responsibilities. I would conclude the Jail's Policy constitutes a term and condition of employment for the COs over which the Jail is required to bargain with the Union. *See* 43 P.S. § 1101.702. Contrary to the Majority's assertion, I do not suggest the Union be permitted to "direct the Jail's policy," *see* Majority Op. at 20 n.12, but rather, consistent with the purpose of PERA, that the COs have the opportunity "to negotiate and bargain" with the Jail over terms and conditions of their employment, including the safety of their work environment. *See* 43 P.S. § 1101.101.

---

[6] I find this to be especially true given the circumstances that gave rise to the Policy here. While the Majority indicates the "Jail alone" is responsible for establishing its use of force policy and that mandating collective bargaining over the Policy would allow the Union to "unduly infringe upon the Jail's ability to affect a desirable policy for this purpose," *see* Majority Op. at 20 n.12, this Policy change was not initiated by the Jail, but in response to the Referendum, which was voted on by the public. Thus, it did not stem from discretionary policy concerns of the Jail. Indeed, at the hearing before the Hearing Examiner, the Jail's warden testified that although he was considering changing some policies, he would not have prohibited the use of OC spray or leg restraints. R.R. at 88a. Additionally, Allegheny County called Jason Batykefer, a Major at the Jail (Major Batykefer), who testified that prohibiting some of these tools under the Policy is inconsistent with "best practices" regarding use of force. *Id*. at 91a. In relevant part, Major Batykefer explained: "The use of [OC spray] in a cell for a cell extraction . . . softens the inmate. The restraint chair. You don't have to carry the inmate. Less risk of injuries to the staff. Less risk of injuries to the inmate. It eliminates . . . the little things that turn into bigger issues." *Id*.

For these reasons, I respectfully concur and dissent.


_____
STACY WALLACE, Judge